(Decided May 11th, 1865.)

---

WALTER BILLINGSLEA *vs.* JOHN S. BALDWIN and Wife, and others.

PRACTICE IN EQUITY: TRUSTEE'S SALE, RATIFICATION OR REJECTION OF.—A trustee, under a decree in equity, having made sale of a remainder in fee, expectant upon a life-estate, reported the sale and obtained an order of ratification *nisi;* the purchaser, however, for nearly four years there-

Billingslea *vs.* Baldwin & Wife, *et al.*

after, failed to comply with the terms of sale, paying nothing on the purchase, and declaring that he would not take the land unless the title was guaranteed by the trustee; it also appeared that the purchaser was without the ostensible means of payment; that he left the State of Maryland, and remained absent until after the death of the tenant for life, and the consequent enhancement in value of the property; when he returned, and withholding the fact of the death of the tenant for life from the trustee, paid the purchase money and claimed a ratification of the sale. On exceptions filed, objecting to the final ratification of the sale—HELD:

That there is nothing in the circumstances of the case requiring a Court of Equity to confirm the inchoate contract between its agent, the trustee, and the supposed purchaser, and that the sale should be set aside.

SALE OF REAL ESTATE OF PARTIES HOLDING JOINTLY, WHETHER BY DESCENT OR PURCHASE: JURISDICTION IN EQUITY: ACTS OF 1785, CH. 72, 1820, CH. 191, 1831, CH. 311, AND 1839, CH. 23, CONSTRUED.—A bill in equity, for the sale of the reversionary interest in real estate, alleged: that the complainants were "seized in fee-simple, jointly with the defendants, of the reversion of a parcel of land devised to W. B. for life," &c.; "that the said lands are incapable of division, and it would be advantageous to all parties concerned to have the said lands sold;" and that "the complainants, with their joint owners, claim said land as the heirs-at-law of E. B., deceased, to whom the reversion in fee was devised," &c.; and that certain of the defendants were infants; and prayed for a decree for the sale of the lands, and for general relief. HELD:

1st. That under the allegations of the bill, the jurisdiction of the Court must be exercised under, and the proceedings regulated by, the provisions of the Act of 1785, ch. 72, and its supplements.

2nd. That the words "*joint interest*," in sec. 12 of the Act of 1785, ch. 72, are not to be construed technically as meaning only an estate in "*joint tenancy*," but includes estates in "*co-parcenary;*"—interests held jointly with other persons, within the meaning of the statute.

3rd. That the Acts of 1831, ch. 311, and 1839, ch. 23, are in *pari materia* with the Act of 1785, ch. 72; these Acts are to be construed together, and confer upon Courts of Chancery the power to decree the sale of any interest in lands, when it shall appear for the interest of all parties holding the same *jointly*, whether they hold by descent or by purchase.

4th. That the proceedings in this case being instituted under and in conformity with the provisions of the Act of 1785, ch. 72, the Court had the jurisdiction and authority to pass the original decree, upon proof of the allegations of the bill, without pursuing the course prescribed by the Act of 1820, ch. 191.

5th. That the Act of 1820, ch. 191, is not in *pari materia* with the Act of 1785, ch. 72; these Acts are altogether distinct from each other, and the jurisdiction and proceedings under them, respectively, are wholly distinct and dissimilar.

Billingslea *vs.* Baldwin & Wife, *et al.*

BILL OF REVIEW: PLEADING AND PRACTICE IN EQUITY: DECREE, RESCISSION OF.—The petition for a bill of review of the proceedings above referred to, and for the rescission of the decree under which the aforesaid sale was made, set forth, among other reasons for the relief prayed: That "one of the original petitioners was a minor, who had come of age since the decree, and within nine months from the date of the petition," and that "the estate belonged to the petitioners as heirs-at-law of E. B., who died intestate thereof," and that "the petitioners were entitled to the benefit of the Act to direct descents, of which, by said decree, they are deprived. The bill of review repeats these allegations, which were not controverted, but substantially established by the proof, from which it also appeared that the witness who, in the original proceeding, proved "that it would be to the advantage of the parties to sell," &c., intended to prove, only, that it would be advantageous to sell the entire fee-simple, and not the reversionary interest of the parties, and would have then so testified, had he understood the interrogatory. HELD:

That the bill of review in this case, and the proof adduced in its support, do not show any sufficient grounds for rescinding the decree, either by reason of irregularity on the face of the proceedings, or on account of any newly discovered facts.

APPEAL from the Equity Side of the Circuit Court for Harford county.

On the 19th day of December 1843, during the life of Walter Billingslea, Sr., the devisee for life, under the will of Walter Billingslea, deceased, of certain real estate mentioned in the will, Pue and wife filed their bill on the Equity Side of Harford County Court, against John T. Baldwin and wife, and others, children of Elisha Bull, deceased, alleging that the complainants and defendants are jointly entitled to the reversion in the lands now in the possession of Walter Billingslea, Sr., the devisee for life; that the same are incapable of division, and it would be advantageous to all parties concerned to have the said lands sold; that they claim the same as heirs-at-law of Elisha Bull, deceased; that the defendants, Mary C. and Sarah Ann Bull, are infants, and praying a decree for the sale of the lands, and general relief.

Answers were filed by the adult defendants, admitting the allegations and consenting to the sale, and answers for the infants, by their guardians, were filed in the usual form.

On the 3rd of February 1849, a decree for a sale was passed and a trustee appointed.

The trustee, on the 9th of July 1849, reported that he had sold the lands (being the reversion belonging to the heirs of Elisha Bull, deceased, after the life-estate of Walter Billingslea, Sr.,) to Walter Billingslea, (the son,) for $695, payable according to the terms of the decree, *with which the purchaser agreed to comply by memorandum in writing.*

On the same day an order of ratification *nisi* was passed, but no further proceedings were had until the 30th of June 1853, when the defendants filed objections to the ratification of the sale on several grounds, viz:

1st. Because the decree was prematurely and erroneously passed.

2nd. The defendants, Baldwin and wife, were never duly summoned, never appeared or answered, or authorized any one to appear and answer for them, and their answers were filed by mistake, and without their knowledge and consent.

3rd. Because it was not for the interest and advantage of the parties in interest, or any of them, that the lands should be sold during the life of the tenant for life, and the sale was greatly below and not exceeding one-sixth or seventh of the actual value of the land.

4th. Because the purchaser abandoned the sale, and refused to comply with the terms of sale, and both the objectants and purchaser understood and believed that the sale had been cancelled, and no sale would be made until after the death of the tenant for life.

5th. Because, since the death of the tenant for life, which has recently occurred, and by which the value of the interest decreed to be sold has been greatly enhanced, the purchaser has fraudulently procured the sale reported by the trustee to be renewed and revived at the same price, notwithstanding he had long before abandoned and relinquished the same.

6th. Because some of the objectants had no sufficient notice of the time and place of sale, and the proceedings are in other respects imperfect and erroneous.

For which reasons the objectants prayed the sale might be set aside, and that they might have leave to file a bill of review, to have the decree for the sale reconsidered and va-cated, as well for errors apparent on the face of the proceed-ings, as on the facts which have come to their knowledge since the date of the decree.

On the 9th of September 1853, the same objectants filed a petition for leave to file a bill of review, in which it is averred that Baldwin and wife were never summoned, and never appeared or answered, or authorized any one to ap-pear for them, and none of the petitioners had any notice of the taking of testimony in the cause, nor did they know, until very recently, that any testimony had been taken; that recently, and within the last three months, and not before, it became known to Baldwin and wife that they had been made parties to the cause, and that an answer had been filed in their name, admitting the allegations of the bill, though they could at any time have proven the most material allegation in the bill was not true, and that it was not for the interest of the parties to have the land sold; that within the last two or three months they have ascer-tained there was no testimony, in fact, taken to prove that the sale would be advantageous to the parties, but that there are errors in the commissioner's return, and the wit-nesses who were examined only proved that a sale of the en-tire estate, including the life-estate, would be advantageous, but that a sale of the reversionary interest, alone, would be very injurious and prejudicial to the parties entitled; that the decree was obtained by surprise and mistake; that the cause was submitted for decree by the complainants and their counsel, without the knowledge or consent of the pe-titioners; and that these and other facts which have recent-ly come to their knowledge, within the last two or three months, and of which they could not have the benefit at the date of the decree, would, if known to the Court, have prevented the passage of the decree; that they are, more-over, advised that the decree and the proceedings under

which it was passed, are irregular and erroneous, as appears upon their face: 1st. Because the Court, by which the decree was passed, had no jurisdiction to decree the sale of the reversionary title, subject to the life-estate. 2nd. Because the said estate belonged to the petitioners, as heirs-at-law of Elisha Bull, who died intestate thereof, and they were entitled to the benefit of the Act to direct descents, of which they are deprived by the decree. And 3rd. Because the proceedings are in other respects irregular and erroneous.

Upon this petition leave to file a bill of review was granted, and on the 17th of October 1853, the bill was filed by the defendants against the complainants in the original bill, not making either the trustee or the purchaser a party thereto. In this bill the allegation of the original bill, that it would be advantageous for all parties concerned to have the land sold, is denied to be true, and the complainants especially deny that it was, or that any judicious person ever believed it was for the interest of the parties to have the land sold subject to the life-estate, and this would have been proved if they had ever had an opportunity to do so; that it was manifestly for their interest that the land should not be sold before it had vested in possession, and that the Court had no power or jurisdiction to decree the sale of the remainder.

It contains the further allegation, by Street, that he never did consent, nor was he willing for a decree for a sale, nor did he or his wife ever authorize or employ any solicitor or other person to appear for them, or make any agreements, or do any act in the premises in their name and on their behalf, and only recently, and long since the decree, to wit: within the last six months, has it come to their knowledge that they have been represented by a solicitor, whose appearance and acts in the case, they aver to have been entered by some mistake; and Street avers that throughout the whole proceedings he understood and believed that Messrs. Scott and Fernandis were the joint solicitors of the complainants, and not of the defendants, or of any of them;

that the decree is erroneous, because it directs the sale of a remainder, and because the estate decreed to be sold was one to which the parties were entitled by descent, and no valuation of the land was made by commissioners, and no opportunity given any of the heirs to take the land and pay the others their proportionate shares; and because the proceedings were irregular and defective, and not in accordance with the Acts of Assembly in such case made and provided; that at the last May Term of this Court, Baldwin and wife ascertained that they were made by the proceedings to appear to have been parties thereto, &c., but that no subpoena was ever issued for them to the county in which they resided, and to the best of their knowledge and belief, they never were summoned, and never did appear or answer, or employ or authorize any solicitor to appear or answer for them, or make any agreements for them in the case, and that the answer and agreements appearing to have been filed, were so filed without their knowledge, authority or consent; that they had no notice of the taking of testimony, and that they have recently ascertained that two witnesses were examined, one of whom would have proved that the sale would be very injurious to them, but the interrogatory on that point was not put to him, and that the other witness misunderstood the question, and only meant to testify that a sale of the whole estate would be advantageous and advisable, and in support of these allegations the affidavits of the two witnesses are filed as exhibits with the bill; that the decree was obtained and passed by mistake and surprise, and that they are greatly injured thereby; and prayed that it be reversed, and the original bill dismissed.

Hoskins, in his affidavit, filed as an exhibit to this bill, swears that he knows the lands, and thinks they would sell at public sale for over $5,000, but to sell them subject to the life-estate, would necessarily cause a great sacrifice, and he thinks that during the life of the tenant for life, it must have been apparent to every judicious man who knew the property, that it would be very prejudicial to the tenants in

remainder to sell their estate at public auction, subject to the life-estate, and that his opinion is not founded on the fact that the life-tenant is since dead, but upon the fact that persons can seldom, if ever, be found to purchase such titles, except at prices far below the real value; that the land was not deteriorating in value, and if it had been, that fact would have caused a still greater sacrifice in a sale subject to a life-estate; that the land has been greatly increasing in value for the last ten years, and that the heirs of Elisha Bull were in easy circumstances, so that there was no necessity for sacrificing their property by selling the land before their title had vested in possession.

Ady swears he did not understand he was questioned whether it would be more to the interest of the parties to sell their reversionary title, or to wait until the death of the life-tenant, and that he only meant to testify that in his opinion it would be more advantageous to the parties entitled to sell the land (meaning the entire estate in fee-simple) than for the parties to hold it jointly or attempt to divide it; that the farm could not be expected to sell subject to a life-estate, without great sacrifice, and if he had understood the question, he must have so answered on his examination.

The answer of Pue and wife to this bill, was filed on the 14th of November 1853, in which, after making certain admissions and averments not important to be here noticed, they submitted their case for such decree as might be proper.

Upon this bill and answer the cause was submitted for a decree, and on the 30th of May 1854, a decree was passed vacating and annulling the original decree of 1849.

On the 1st of June 1854, the day after the passage of the above decree, the purchaser filed his petition, in which he avers all the proceedings to be regular; that due notice of the sale was given by publication, according to the terms of the decree; that he had bought the land, paid his purchase money, and deems himself entitled to the land; that the objections to the sale have not been decided on, and he has

always been and is now ready to contest their validity; that in a case to which he was not a party, and of which he had no notice, the original decree has been annulled, by which his interests have been set aside and disregarded; and he prays that the annulling decree be opened, so as not to affect his rights as purchaser.

On the same day (1st June 1854) the trustee, H. D. Farnandis, Esq., filed his answer to the objections to the sale, in which he states, that as far as his knowledge extends, the proceedings in the cause were proper, regular and legal; that all the parties were duly returned summoned by the sheriff; that the answer of Street and wife was signed by themselves, and the answer of the infant defendants taken by a guardian regularly appointed, John E. Bull, their step father; that the answer of Baldwin and wife appears to be signed by him as their solicitor, and he believes he had satisfactory authority to sign the same, as, without such, he would not have volunteered to do so; that he saw Baldwin after the sale, and certainly to the time of filing the objections to the sale, never heard any objections to his so acting; that he sold the land at public sale, after advertisement, in accordance with the decree, fairly and for the best price he could obtain, and at the time deemed it satisfactory; that he never heard the price complained of during the life of the tenant for life; that the purchaser did not comply at the time with the terms of sale, having had, as the trustee was informed, the opinion of distinguished counsel, that the heirs of Elisha Bull had no title to the premises, but that the trustee never did cancel or agree to cancel said sale; that proceedings to compel him were not had, because, in consultation with the complainant, Pue, it was determined that it would be advisable to let the matter stand as it was until it would be ascertained that on a re-sale a sufficient price could be had to pay the costs of the proceedings, which it was not supposed could be enforced from the purchaser; that the purchaser did propose to relinquish or to transfer, at the original price, said lands, which was

communicated to Pue, but not assented to; that the sale was made on the 7th of May 1849, was confirmed *nisi* on the 9th of July 1849, and the order *nisi*, running to the 20th of August 1849, was duly published in the Harford Gazette, for three successive weeks, before said 20th of August 1849, and no objections were filed until the 30th of June 1853; that in May or June 1853, the purchaser called on the trustee and professed his willingness to comply with the terms of sale, and the trustee received part, and a few days afterwards the whole, of the purchase money; that he did not at that time know of the death of the tenant for life, but in a few days after the first payment, Pue called on him, informed him of the death of the life-tenant, and requested him not to receive the purchase money, as the land would sell for a good deal more, but he had already received part, and did not suppose he had any discretion in the matter; that the objection filed to the ratification, on the 30th of June 1853, gave the trustee the first intimation of their purport. This answer was sworn to by the trustee.

On the 14th of December 1854, an agreement was filed, by which it was agreed that the annulling decree should be opened, and that it stand for hearing with the objections to the sale, to be heard together at the next term.

On the 26th of February 1857, a supplemental bill of review was filed by the same parties, for the purpose of making the purchaser a party, in which the complainants reiterate all the allegations of the original bill of review, and again aver and charge them to be true.

On the 6th of September 1858, depositions taken before a justice of the peace, by both parties, were filed in the cause, and on the same day an agreement was filed that the purchaser be made a party to the bill of review, and that the affidavits filed by the respective parties be read as evidence, to have the same effect as if regularly taken under a commission, and submitting the cause for final order of Court.

Billingslea *vs.* Baldwin & Wife, *et al.*

On the 21st of September 1858, the purchaser filed exceptions to the evidence of the complainants, not for the mode in which it was taken, but for the matter and substance thereof, and because the same is insufficient and inadmissible, if it had been taken under a commission for that purpose regularly issued.

On the 5th of August 1862, Judge Price filed an opinion in the case, in which he simply says: "It seems to me that the cases of *Tomlinson vs. McKaig*, 5 *Gill*, 256, and *Cheney vs. Tipton*, 11 *G. & J.*, 255, are decisive of the present case. There has been no compliance with the provisions of the Act of 1820, ch. 191, and for this reason I am of opinion that the decree should be vacated, and the sale set aside;" and on the next day he passed an order setting the sale aside, and also signed a decree vacating and annulling the original decree of 1849.

On the 18th of August 1862, the purchaser appealed from both the order and the decree, and filed his appeal bond, which was duly approved.

The cause was argued before Bowie, C. J., and Bartol, Goldsborough, Cochran and Weisel, J.

*O. Miller*, for the appellant:

The questions presented by the record are:

1st. Is there any thing on the face of the proceedings, or has any thing occurred since the decree, to warrant setting it aside on a bill of review?

2nd. Is there any thing connected with the sale to invalidate it?

1st. There is nothing on the face of the proceedings that is irregular, unless, indeed, the praying for the sale or partition of a remainder be error.

A remainder is an interest in land, and all interests in lands may be sold under the Act of 1785, ch. 72, sec. 12. This Act does not say "where lands are held jointly by infants," &c., but "where an interest in lands is so held."

The Act of 1831, ch. 311, sec. 7, authorizes the sale of any interest or estate, or benefit held jointly or in common, or otherwise, concurrently by adults. This is supplementary to the Act of 1785.

The Act of 1839, ch. 23, authorizes the sale of any lands or real estate held jointly by any persons.

The Act of 1847, ch. 150, recognizes the right to decree a sale of reversionary interests.

These Acts being in *pari materia*, are to be taken together, and they give the power to sell any interest held jointly.

Why should not a joint remainder be sold, as well as a joint estate in possession? The words of the law are broad enough to include them, and there is the same reason why a joint holder of a remainder should have his part turned into money, as, if it were an estate, into possession; and, in many cases, a stronger reason, because a remainder must necessarily be unproductive. Then, if the words of the law and its reason both include remainders and all interests in lands, why exclude them?

The idea that the word jointly only includes joint tenants, and does not apply to parceners, is too technical to be true; such a construction would, perhaps, nullify the Act of 1785, for as joint tenants could only be created by purchase, all holding by descent would be excluded.

The true rule, deducible from all these Acts, is, that whenever the parties are entitled to have partition, either by common law or by statute, a sale may be decreed, if more advantageous to the parties.

If we are right in our views, there is no error on the face of the proceedings.

Then what newly discovered matter is there? None that we can perceive. The rule is, that any thing the party might have ascertained by due diligence, will not avail him, and there is nothing alleged that Baldwin, by ordinary enquiry, might not have ascertained, and he certainly had sufficient notice to put him on inquiry.

But it is alleged Baldwin and Street had no notice of the decree; as to Street, this, when it was ascertained he and his wife had signed their answer, was prudently abandoned. Baldwin and wife were returned summoned. by the sheriff, and their answer filed by H. D. Farnandis, who says he must have been authorized, or he would not have done it, and his appearance for them is conclusive upon them. *Hench vs. Todhunter*, 10 *G. & J.*, 358.   And the return of the sheriff is *prima facie* proof of service.   *State vs. Lawson*, 2 *Gill*, 62.   *Keedy vs. Newcomer*, 1 *Md. Rep.*, 241. *Parker vs. Sedwick*, 5 *Id.*, 281.   That he and his wife were summoned, is matter of record, and whether he lived in Harford county, or just over the line, in Baltimore county, is wholly immaterial.   No matter where he lived, if the sheriff found him in this county, it was his duty to summon him.   Baldwin and wife, for any thing that appears in the proceedings, then lived in Harford county.   But whether they did or not, the sheriff could summon them, if he found them here; and he has returned that he did, and his return is made under oath.   A sheriff cannot arrest a person out of the county where the party lives, under the Act of 1801, but this does not apply to summons from Chancery.   Any person except the complainant can serve a *subpœna*.   See *Alexander's Ch. Prac.*, 18.   But there is abundant proof that Baldwin had notice of the decree; the affidavit of Mrs. Bull, if admissible, shows the matter was frequently talked about.   The affidavit of Jacob Warn shows Baldwin knew of the sale, and gives the reasons for the objections to the sale, to wit, the tenant for life had unexpectedly died, which increased the value of the property.

But there is no reason why Baldwin and wife should not be bound by their answer; it is put in as answers generally are in undisputed cases, and it is clear neither Baldwin, Street nor Pue ever designed resisting the sale till after the death of the tenant for life, then they all resisted it; and there is reason to believe that Street would have denied his answer, if he

had not signed it himself. See *Munnikhuysen vs. Dorset*, 2 *H. & G.*, 374.

The sale was advertised, and made publicly at Belair, when the order of ratification was published; Baldwin lived within seven or eight'miles of Belair, and was in the habit of visiting his mother-in-law, Mrs. Bull, who lived within three miles of Belair; he saw the trustee after the sale. Under all these circumstances, it is impossible he should not have had notice, at least such notice as should have put him on inquiry.

Respecting Baldwin and wife's answer, there is no proof to invalidate that. If the mere denial of the party, either from not recollecting or otherwise, that he did not authorize a solicitor to appear, would invalidate a decree four years after it was passed, how many decrees might be vacated? The fact that the complainant's and defendants' counsel were generally partners in their practice, could make no difference in undisputed cases. Partnership between lawyers does not so unite their persons as to make them one. Either could undertake business separately, and, by consent, would take the opposite sides of a case, and would be bound to be faithful to their respective clients.

A power of attorney is not necessary to authorize the appearance of an attorney in this State, and the party is bound by the acts of his attorney. *Hench vs. Todhunter*, 7 *H. & J.*, 275. And if this were not so, no one could tell when his judgment or decree was valid, or whether it might not be vacated at any time by some of the defendants coming in and denying the authority of their attorney.

If such an objection could be made in this case, it would be made in a case where the purchaser had made expensive improvements; and, in fact, all manner of injustice might be done, and done to persons who had no means of knowing any thing of the relations between the parties and their attorneys, except what is shown by the record. In this case if the purchaser looked at the record—and, as he was a

stranger to the decree, it is all he was required to do,—he there saw that every thing was regular and in the usual form, and he had a right to consider the parties to that suit bound by the acts of the attorneys who appeared for them.

Assuming, then, that Baldwin and wife are bound by their answer, there is nothing in the proceedings to affect the decree.

A Court of Equity is not a Court of limited jurisdiction, it has vast powers exclusive of those conferred by statute. In *Dorsey vs. Gilbert,* 11 *G. & J.,* 87, the Court say: "It was the undoubted power of the Court of Chancery, before our Acts of Assembly, to convert the real estate of infants into money." And in *Young vs. Frost,* 1 *Md. Rep.,* 398, the Court say, citing Judge Story: "In cases of partition, a Court of Equity founds itself on its general jurisdiction," &c.; so that it has large powers independent of even legislation. It could sell the real estate of infants before the Act of 1785. It can certainly sell any interest held by adults under the 7th section of the Act of 1831, ch. 311. Under its general powers and the Acts of Assembly, it can sell any interest of infants. These powers confer jurisdiction in this case clearly. A Court of Equity has a right to apply all its powers to a case, whether derived from statute or otherwise.

2nd. Is there any unfairness in the sale? The Courts lean to the support of trustees' sales, as will be seen by the authorities cited at the end of these notes. The sale was publicly made, after due notice, and fairly made, and for a fair price. There is no allegation that the sale was not advertised regularly, or was not fairly made, and the trustees' answer shows that all was regular and fair.

The affidavits of value all relate to the unincumbered value; no witness says the sale of the reversion was too low, and the affidavit of George Mechien, and the conduct of the parties, Pue and Street and Baldwin, show the price was fair, and perhaps high, for they never complained of

the price for four years after the sale, nor until the life-estate fell in. The extravagant estimates put on the land are not deemed material to the questions in this case, but when we learn from the affidavit of J. Mechien that the land was of the poorest quality, some of it broken and rough, without fences or buildings, and without timber, and with not more wood than would supply fuel for a few years, we cannot perceive what these witnesses base their opinions of its value upon. The counsel on the other side estimates it at $6,000; I am authorized by Billingslea, the purchaser, to say that any one may have the land for less than half that sum, although he has put considerable improvements on it.

Another objection to the decree and sale is, that the witness, Ady, who proved it would be advantageous to sell, was mistaken, and Ady, himself, says he was mistaken. This objection goes to the decree, not to the sale. Can such an objection be urged against a decree four years after its passage? If so, no decree is final. In this case all the parties of full age consent to the decree, and the proof is only necessary because there are infants, and as the parties of full age have identically the same interest as the infants, the Court would not require many witnesses to prove what the parties of full age admitted in their answers.

But the witnesses who say that a sale was not beneficial, found their opinion, as will be seen from their affidavits, on the theory, that no estate in remainder ought to be sold. If the remainder men were ever so pressed for money, still, in the opinion of these witnesses, the remainder ought not to be sold, because if they would wait long enough, the estate might be sold unencumbered. Sometimes, every common sense man knows, that it is more advantageous to sell a remainder, which is unproductive, than to keep it. How often is land sold subject to dower, or to curtesy? According to these witnesses, such sales should never be made, because if the party would wait, he could sell the land for more, by selling it unencumbered. Sometimes the remain-

der man would wait fifty years. But in this case it is fair to presume, that Pue and Street understood their interests, and they thought that it was advantageous to all concerned, to sell, rather than to wait for Billingslea's death, when from his health and constitution, he was as likely to live twenty years as any body.

The purchaser never abandoned the sale, and would not abandon it. The trustee never intimated he would be discharged. The purchaser, as his answer shows, and he is confirmed by C. Bussey, was doubtful of his title, having been informed by counsel, that this remainder did not pass under W. Billingslea's will to Elisha Bull, and thought he would demand a warranty of the trustee. Events subsequent to the sale, ought not to affect its validity. *Cunningham vs. Schley*, 6 *Gill*, 208. *Gibbs vs. Cunningham*, 1 *Md. Ch. Dec.*, 44. *Bank vs. Martin & Travers*, 3 *Id.*, 224. The purchaser was bound by the trustee's report, and the purchaser being bound, the trustee was bound:— one could not be bound without the other.

For these reasons it is submitted, that the bill of review ought to be dismissed, and the sale confirmed.

The authorities cited in support of the aforegoing are appended, as well as the authorities cited by the complainants.

Cases cited by Purchaser:—*Harris vs. Harris*, 6 *G. & J.*, 111. The Chancellor, under the Act of 1785, may order a sale of an executory devise. The opinion of the Court seems to be based on the word *interest*, in the Act. The Court italicises that word.

*Burk vs. Scott*, 1 *G. & J.*, 424. A bill of review must be for some matter appearing upon the face of the decree, or for some new matter discovered since the decree. *Story's Eq. Pl.*, secs. 404, 411. *Danl. Ch. Pr.*, 1726, 1727. *Mewshaw vs. Mewshaw*, 2 *Md. Chan. Dec.*, 12, was a case of a bill of sale of lands under the Act of 1831, though objected that the proceedings should have been under the Act to direct descents. *Johnson vs. Dorsey*, 7 *Gill*, 269, and

*Cunningham vs. Schley,* 6 *Gill,* 208, show how trustees' sales will be sustained. See, also, *Tomlinson vs. McKaig,* 5 *Gill,* 258. *Cheyney vs. Tipton,* 11 *G. & J.,* 255; and 3 *Gill,* 327.

*Henry W. Archer,* for the appellee, argued:

1st. That the original decree was erroneous, and was properly vacated.—The title as stated in the complainant's bill makes a case under the Act to direct descents, 1820, ch. 191. And the preliminary proceedings required by the Act were omitted. *Cheyney. vs. Tipton,* 11 *G. & J.,* 255. *Tomlinson vs. McKaig,* 5 *Gill,* 256. *Phelps vs. Stewart,* 17 *Md. Rep.,* 239.

2nd. That the court had no power to decree the sale of the estate in remainder, without including the preceding life estate. The land may be sold, but the title must be conveyed without encumbrance. The title must not be divided. The Act of 1785, ch. 72, sec. 12, was manifestly not intended to apply to such a case. The Act of 1816, ch. 154, sec. 13, authorises the Court to decree sales of estates of infants in reversion or remainder, but it and its supplements prescribe particular mode of proceeding, to prevent abuses and improper sales,—which have not been followed. The Acts of 1785, ch. 72, sec. 12; 1816, ch. 154, sec. 13; 1818, ch. 133, sec. 2; 1831, ch. 311, sects. 6 and 7; 1839, ch. 24; 1820, ch. 191; must be taken in *pari materia,* but force must be given to each, except where they clash. The Act of 1785, refers to estates in possession. Partition cannot be made of estates in remainder or reversion. 1816, uses the word " possessed;" 1831, the words " concurrently seized of any lands." Infants' estates are to be sold according to the provisions of 1816 and 1818, the estates of adults under the Act of 1785. The Act of 1839, explains 1785 and 1831.

3rd. That the return of the commission to take testimony is defective and void, and the commission in other respects is so imperfectly and irregularly executed, that the evi-

dence taken under it was inadmissible, and cannot be used as evidence to support the decree. *Story's Eq. Pl.*, 404, 411 and 412. *Scott vs. Burch*, 1 *G. & J.*, 423.

4th. That it was not in fact "for the interest of all the parties concerned," that the reversion should be sold, and the evidence relied on to prove that it was, was taken by mistake.

5th. That Baldwin and wife were not summoned. And as to the other defendants, who were entitled—being all infants or married women,—no laches can be imputed to them, and their rights will be protected by the Court. *Barret vs. Oliver*, 7 *Gill & John.*, 207. *U. S. Bk. vs. Ritchie*, 8 *Peters*, 128. *Knight vs. Brawner*, 14 *Md. Rep.*, 70. There is no *limitation* to a bill of review, but it may be filed at any time within which an appeal or writ of error may be taken,—by analogy,—except in cases of surprise, fraud or mistake. *Palmer & Hamilton, vs. Oliver*, 11 *G. & J.*, 143. *U. S. Bank vs. Ritchie*, 8 *Peters*, 128.

In support of the order setting aside the sale to the appellant, the appellee will contend:

1st. That if the decree is vacated, the sale made under it must share the same fate, especially as it had never been ratified, and could not be considered an absolute sale until confirmed by the court. *Tomlinson vs McKaig*, 5 *Gill*, 275. *U. S. Bk. vs. Ritchie*, 8 *Peters*, 128. *Wagner vs. Cohen*, 6 *Gill*, 99, 102.

2nd. That the price at which the land was sold, was so grossly inadequate, as to furnish *prima facie* evidence that the sale ought not to be ratified. And in connection with the other circumstances of the case it was sufficient to justify the final order passed by the court. *Tomlinson vs. McKaig*, 5 *Gill*, 273. *Johnson vs. Dorsey*, 7 *Gill*, 282, 292. *Duncan vs. Dodd*, 2 *Paige*, 99. Gross inadequacy of price is evidence of want of discretion. *Sug. on Vend.*, 249.

3rd. That the sale was not made according to the terms prescribed by the decree, and was therefore more liable to be set aside than if the terms prescribed had been adhered to. 8 *Peters*, 146. *Cohen vs. Wagner*, 6 *Gill*, 252. *Tyson vs. Mickle*, 2 *Gill*, 384.

4. That the appellant having refused to comply with the terms of sale, and held himself in a position in which it could not be enforced against him for four years, and until after the value of the property was greatly enhanced,—was not entitled after that to insist upon its ratification. *McCay vs. Carrington*, 1 *McLean's C. C. R.*, 59. 6 *Gill*, 102 and 252. 2 *Gill*, 384. 2 *Story Eq.*, sec. 736. *Geiger vs. Green*, 4 *Gill*, 472. *Stoddart vs. Bowie*, 5 *Md. Rep.*, 18, 35. *Livingston vs. The Penn. Iron Co.*, 2 *Paige*, 391.

5. That the appellant, when he came to pay the purchase money in 1853, practiced a fraud on the trustee by concealing the fact that his father, the tenant for life, was dead, and the value of the estate was thereby greatly increased. *Story's Eq. Coulter vs. Dawson*, 2 *Bl. Ch.*, 204. *Andrews vs. Scotton*, 2 *Bl. Ch.*, 639, 644.

The sheriff's return is not *prima facie* of service of a writ against one not in his bailiwick.

Bowie, C. J., after stating the case, (ante p. 87, *et seq.*,) delivered the following opinion, concurring in part in the opinion of the majority of the court, and in part dissenting therefrom :

The principles which govern Courts of Equity, in the consideration of trustees' sales, have been so recently and frequently announced, it is scarcely necessary to repeat them. In *Bolgiano vs. Cooke*, 19 *Md. Rep.*, 392, such sales are declared to be subject to all the principles of equity applicable to judicial sales. Before the ratification of a sale, made by authority of a Court of Equity, all objections within these limits are open for consideration. The sale will be set aside upon proof of error, mistake, misunderstanding or misrepresentation, as to the terms or manner of sale. It must appear to be in all respects fair and proper, or it cannot receive the sanction of the Court. *Tomlinson vs. McKaig*, 5 *G.*, 277. When a Court can see injustice will be inflicted by the ratification of a sale upon a party not in default, the sale should not be rati-

fied." 12 *G. & J.*, 113, *Penn vs. Brewer.* 9 *Md. Rep.*, 240, *Kaufman vs. Walker.*

In the consideration of this point, we forbear any inquiry into the regularity of the proceedings prior to the decree. Assuming those to be in all respects legal, we confine ourselves to the testimony touching the sale.

The property sold was a remainder in fee, expectant upon an estate for life. The purchaser failed to comply with the terms of sale for nearly four years; declared he would not take the land unless the title was guaranteed; waited until the tenant for life died, and its value was enhanced more than four-fold, leaving it exposed, in the meantime, to damage or destruction by fire, flood or inevitable accident, at the risk of the vendor. After the death of the tenant for life, without apprising the trustee of that event, the purchaser paid the purchase money, and claimed the benefit of his bid.

There is nothing in circumstances like these, requiring this Court to confirm the inchoate contract between its agent, the trustee, and the supposed purchaser. The parties in interest might well have inferred, from the laches of the purchaser, his subsequent absence from the State, and non-compliance with the terms, that the sale was abandoned. It would be gross injustice to them, to allow him, after the condition of the property was entirely changed, and its value quadrupled, to appropriate the profits resulting from advanced prices and altered circumstances, without binding himself to the bargain or incurring any of its risks. For these reasons, we think the order setting aside the sale should be affirmed.

The second question presented by the record is, whether there is ground for a bill of review, and the rescission of the decree in the original case, for the sale of the premises?

The appellant insists there is nothing on the face of the proceedings that is *irregular*, unless the praying for the sale or partition of a remainder be error, which estate, he contends, is embraced by the Act of 1785, ch. 72, and other

14    v.23.

Acts referred to by him. This construction of that Act is, we conceive, sustained by this Court in the decision of *Bolgiano vs. Cooke,* before cited. Referring to the Act of 1785, ch. 72, and others, this Court said: "These Acts being *in pari materia,* are to be construed together. They import that any interest or estate at law or in equity, in possession or remainder, belonging to infants held in common with others, or separately, may, *upon proper application by any* of the parties in interest, &c., upon the Court's being satisfied it is for the interest and advantage of the parties, be sold by decree of the Court. The Acts here referred to, were not the Act to direct descents or its supplements, but Acts to enlarge the powers of the High Court of Chancery."

The appellee does not rely on the want of power in the Court, to decree a sale of such interests as are provided for under the Act of 1785, ch. 172, but on the irregularity of the proceedings in the case made, which brought it within the provisions of the Act to direct descents.

The decree appealed from is based, by the learned Judge, on the decisions of this Court, in the cases of *Chaney vs. Tipton,* 11 *G. & J.;* and *Tomlinson vs. McKaig,* 5 *G.,* 258. In the former, this Court said: "The bill is filed by one of the heirs claiming a sale, upon the ground, that the land is not capable of division, and resisted for the reason, amongst others, that it will admit of division. We think that such cases are particularly provided for by the Acts of Assembly regulating descents, and that the proceedings should have conformed to those Acts. The rights of election, and preference secured to certain heirs by the Statutes referred to, must be regarded as intrinsically valuable. They become vested by the death of the intestate, and may be passed to a grantee. This, we hold, is utterly inconsistent with the right now claimed for another of the heirs, to file a bill for sale or partition in a mode which disregards the provisions of the descent laws, and places all the heirs in the same condition, in respect to priority of choice." 11 *G. & J.,* 255.

This decision, in my judgment, would be entirely nuga-tory and unmeaning, if it were optional with any one, so disposed, to evade its authority, by drafting his bill in con-formity with the language of the Act of 1785, ch. 72, sec. 12; vested rights are not to be held at the mere will of any of the parties in interest, nor would they be valuable if they depended on such a tenure. It can scarcely be suppo-sed the learned Court, which pronounced this decision, were ignorant or unmindful of the Acts of 1785, and its supplements, and could have designed to except these from the general denial of the right of any of the heirs to file a bill for sale or partition, in a mode which disregards the provisions of the descent laws, &c. Yet it is contend-ed, that this is a proceeding under the Act of 1785, ch. 72, and because the bill uses the language of that Act, in alleging "that the lands are incapable of di-vision, and it would be advantageous to all parties con-cerned, to have said land sold," the provisions of the Act to direct descents are to be dispensed with. On the other hand, the allegation that the complainants and their co-parceners, claim said lands "as heirs at law of Elisha Bull, to whom the reversion in fee was devised," brings the bill within the provisions of the Act to direct descents. If it properly belongs to the latter jurisdiction, it is obnoxious to the objections so emphatically expressed in the citations previously made. "The character of a bill is determined rather by the allegations and relief prayed, than the title it assumes." 18 *Md. Rep.*, 450. So where a bill is filed for relief, nominally in one character, and alleges facts, showing the complainants are entitled to relief in another, relief will be granted according to the allegations and the proof." *Ibid.*

The original bill in this case charges, that the complain-ants are seized in fee-simple, jointly with the persons there-in named, of the reversion of a parcel of land lying in said county; * * * * * that the said lands are incapable of di-vision, and it would be advantageous to all parties con-

cerned, to have the said land sold; that the said parcel of land is composed of several contiguous tracts called "Bond's Lot," and being all the lands now in possession of Walter Billingslea, the devisee aforesaid; that your orator and oratrix, and their joint owners, claim said *lands as heirs at law of Elisha Bull, deceased,* to whom the reversion in fee was devised as aforesaid; that the said Mary C. Bull and Sarah Ann Bull are infants. It prays the Court to decree said lands to be sold, for *subpœnas,* and for general relief. Where the allegations and relief prayed are both required by or adapted to either Act of Assembly, under certain circumstances, the proceedings must be modified by the rights of the parties. In an analogous case, this Court, speaking of the proceedings for partition, said: "However the practice may have originated, the jurisdiction of the Court of Chancery and County Courts as Courts of Equity, in cases of partition, where the land is situate in one County only, is too well established to be disturbed. Under the Act of 1786, ch. 45, instances occurred in Chancery, and many more in both Courts since the Act of 1810, ch. 191. The proceedings may be by *ex-parte* petition or by bill and answer, but *in both they must conform to the requirements of the descent laws,* and decrees have been reversed for error in this respect." *Phelps vs. Stewart,* 17 *Md. Rep.,* 239, 240. Many cases also show, that where the proceedings are by bill and answer, according to the usual course of the Court, sales have been made by trustees instead of Commissioners, and without objection in the Court of Appeals, although the decrees might have been reversed if erroneous, on that ground."

In *Tomlinson vs. McKaig,* 5 *Gill,* 258, this Court said: "That a right exists on the part of the infant defendants to the original bill, to question its regularity and validity either by a bill of review or an original bill to vacate the same for fraud, cannot be doubted, and we think the Court below should have stayed the execution of the decree until an opportunity might be had of testing the validity of the

original decree by an original bill to be filed by the defendants for that purpose."

"The regularity of the proceedings, after the filing of the bill in the original case, has not been attempted to be vindicated. Not one of the steps demanded by the Act of 1820, ch. 191, have been taken; no order or decree for a commission was passed, of consequence, no judgment of commissioners was had, or confirmation of such judgment; no privilege of election was extended to the heirs-at-law, without which the final decree of the Court could not have been. the legal exercise of jurisdiction. That such matters would have been the subject of a bill of review in an English Court of Chancery, if a decree had there been passed under such a law, could not be questioned. In that tribunal the proceedings in the cause are recited in the decree, and such errors would, therefore, have appeared on the face of the decree, and would have constituted errors which the Court would have noticed on a bill of review.

"In *Birch vs. Scott*, 1 *G. & J.*, this Court announce the rule to be: A bill of review will only lie for errors apparent on the face of the decree, or for some new matter discovered since the decree. In thus saying, this Court but announce the English rule. They were not called upon to apply it to our peculiar practice in framing decrees. We can alone reap the beneficial fruits of the English rule by causing the bill of review to reach such proceedings in the cause as would, according to the English practice, appear on the face of the decree. In conformity with these views, the proceedings were remanded, that time might be given to the adult defendants to file an original bill to set aside the decree for fraud, and to the infant defendants to file a bill of review for errors apparent on the face of the decree.

The defence set up in the case of *Tomlinson vs. McKaig*, was, that there were no allegations in the bill to bring it within the terms of the Act of 1785, ch. 72; and if such had been made, they were untrue in fact, and that the sale was procured by fraud.

In the course of the Court's opinion, they declare the bill was not framed under the Act of 1785, but contained other allegations sufficient to give the Court below jurisdiction under the Act of 1820, ch. 191.

They declare: "That a formal application to the Court may be made by bill to the Court, as a Court of Equity, has been heretofore decided by this Court." But they no where decide in that case, in my judgment, that proceedings may be instituted, under the Act of 1785, by persons .claiming as heirs-at-law to an intestate, for the sale of the lands cast on them by descent, instead of proceeding by bill or petition, under the Act to direct descents.

In the case before us, the petition for the bill of review sets forth, among other reasons, that one of the petitioners was a minor, who had come of age since the decree, and within nine months from the date of the petition; and because the estate belonged to the petitioners *as heirs-at-law of Elisha Bull, who died intestate thereof, the petitioners were entitled to the benefit of the Act to direct descents, of which, by said decree, they are deprived.* The bill of review repeats the same allegations, with the addition, that no valuation of said land was made by commissioners for that purpose appointed, nor was any opportunity given the complainants to take said lands, and pay to the other heirs their proportionate shares. These allegations are not controverted, the most material are established by the record.

It does not appear from the report of the case of *Mewshaw vs. Mewshaw*, that the parties claimed as heirs-at-law of a deceased person, however it may be inferred from the objections urged in support of the demurrer.

The late Chancellor, in his opinion, says: "But this does not appear to me to be a bill for partition. It is a proceeding founded upon and authorized by the 7th section of the Act of 1831, ch. 311, which extends the provisions of the 12th section of the Act of 1785, ch. 72, to parties of full age, who have an interest or estate jointly or in common,

or otherwise concurrently, or in or out of any lands, tenements or hereditaments." 2 *Md. Ch. Dec.*, 13.

The proper subject of these acts was certainly estates acquired by purchase, and not by descent, and however indiscriminate practice may have confounded them, we could not, in the absence of express adjudications to the contrary from the highest authority, hold that at the mere pleasure of any complainant, he might so frame his bill in chancery, by adopting a set *form of words,* as to deprive heirs-at-law of their vested rights under the Acts to direct descents.

Conceiving that the original bill presented a case which brought it within the provisions of the Act to direct descents, which provisions were entirely disregarded in the subsequent stages of the cause, as was apparent from the face of the proceedings, I am of opinion the decree of the Circuit Court, rescinding the original decree for sale, should be affirmed.

WEISEL, J., delivered the following opinion, also concurring in part in the opinion of the majority of the Court, and in part dissenting therefrom:

My understanding of the cases of *Tipton vs. Chancy,* and *Tomlinson vs. McKaig,* is this: that the rights acquired by heirs-at-law, under the Act to direct descents, are intrinsically valuable, vested by the death of the intestate, and the subjects of grant; and that it is the duty of Courts of Equity, upon bills for sale or partition filed by some of the heirs against others, whenever, by the allegations of the bill or otherwise, it is made to appear to them that the parties take by descent, and cannot agree upon a division of the estate, or that some of them are minors, to protect these rights and to conform the proceedings under the bill with the provisions of that Act. Where the bill contains these allegations, whatever other averments may accompany them, then to decree without complying with the provisions of that Act is error, and a bill of review will lie to correct it as an error apparent on the face of the proceedings. If the bill should

omit the allegations necessary to require the Court to adopt the proceedings of the descent law, but would contain others which would give to the Court jurisdiction, (such as the allegation that it would be to the interest and advantage of the infants or other persons concerned, that the lands should be sold, and that the parties hold jointly or in common,) and that the Court would proceed, upon the proper proof or admissions, to decree a sale, and it should, in fact, be that the parties hold by descent, such decree would be erroneous, not for any matter appearing in the decree or proceedings, but for matter which existed at the time, but was not then brought to the knowledge of the Court; and this decree could be examined upon a bill of review by any of the parties in interest, and under disability at the time, if filed within the proper period. In both cases the Court would have jurisdiction, for that is determined by the allegations of the bill, but the error is that which arises in the exercise of jurisdiction.

The case of *Mewshaw vs. Mewshaw*, 2 *Md. Ch. Dec.*, 12, does not appear, from the report of it, except by inference, to have arisen in a case of intestacy. If, however, it was a case of that kind, and so presented in the bill and proceedings, I conceive, with great deference to the opinion of so great a jurist as Chancellor Johnson confessedly was, that he misapprehended the views of the appellate Court in *Tomlinson vs. McKaig*, and being the judgment of an inferior tribunal, it could not have the effect of overruling the decision of this Court more than once carefully and deliberately formed.

The proceeding in the case now under consideration arose under, and is to be governed by the law of this State, and the decisions thereunder, prior to the adoption of the Code. How far the provisions of the Code, upon the subject of partition, and the equitable powers of the Courts to decree in such cases, differ from those that existed before, is not now the subject of inquiry.

I concur with the other members of the Court, in the opinion and decree, that the sale made by the trustee should be

set aside. It appears, from the proof, that all interested were led to believe that the sale was not to be perfected, and that it was the declared intention of the purchaser himself, who had paid nothing on the purchase, who possessed no ostensible means of payment, and who left the State for the West, not to comply with the terms of sale unless the trustee would enter into a covenant which it was not his province or his duty to make. To allow him, under such circumstances, and after the lapse of several years, and the falling in of the life-estate, which imparted a sudden value to the entire property, then to come in and pay, and claim the advantage of his purchase, would. be to aid him in a speculation disadvantageous to those really interested, and in which the Court ought not to participate.

I agree with the Chief Justice in the other branch of this case. I entertain the opinion that it is a case for a bill of review, upon the authorities I have already referred to. It is not necessary to advert to the evidence that was brought into the original cause by the mistake of the witness, and upon which the original decree was based. That would have constituted matter for consideration if the case had been one that would have been regularly conducted under the Act of 1785, ch. 72.

BARTOL, J., delivered the opinion of the majority of the Court:

In the opinion of a majority of this Court, there was error in the decree of the Circuit Court, passed on the 6th day of August 1862, annulling and setting aside the original decree of the 3rd day of February 1849. , The learned Judge of the Circuit Court placed his decision upon the cases of *Chaney vs. Tipton,* 11 *G. & J.,* 255; s. c., 3 *Gill,* 327; and *Tomlinson vs. McKaig,* 5 *Gill,* 256. In those cases the proceedings were under the Act of 1820, ch. 191, (the Act to direct descents;) and in both it was held that the proceedings must conform to the provisions of the

descent laws. In *Tomlinson vs. McKaig*, the Court of Appeals, Chief Justice ARCHER delivering the opinion, determined, that for want of the necessary averments in the bill giving the Court jurisdiction under the Act of 1785, ch. 72, the jurisdiction of the Court under that Act could not be sustained. It was further decided that the jurisdiction made by the bill being maintainable only under the Act of 1820, ch. 191, the requirements of that statute must be followed; to that extent affirming the decision in *Chaney vs. Tipton*, which we do not mean to impugn. In the same case, however, the Court say: "The jurisdiction under the Act of 1785, ch. 72, could not be sustained, because there is no allegation in the bill *that it would be for the interest and advantage of the infants, and of the other persons concerned, that the lands described in the bill should be sold. Such an averment is necessary to give the Court jurisdiction under this Act.*"

In this case the original bill contained this averment, and we understand the language of the Court in *Tomlinson vs. McKaig*, just cited, clearly to decide that in such case the jurisdiction of the Court is exercised under, and the proceedings are regulated by, the provisions of the Act of 1785 and its supplements. The decision was so understood by the late learned Chancellor, and his decision in the case of *Mewshaw vs. Mewshaw*, 2 *Md. Ch. Dec.*, 12, was made in conformity therewith.

The case of *Mewshaw vs. Mewshaw*, was decided in 1849, and we are not aware that its correctness has ever been impugned or questioned. The decisions of that learned jurist have always been held in the highest respect in this State. In his opinion, then delivered, he stated that "frequent decrees of such a character have been passed," and we may add that many more have been passed since that decision was pronounced.

The question may, we think, be considered as concluded by what was said by the Chief Justice in *Tomlinson vs. McKaig*, and by the decision of the Chancellor in *Mewshaw vs.*

*Mewshaw;* as well as by the long established practice of Courts of Chancery in this State. But if the question were a new one, we think the construction of the Act of 1785, ch. 72, is free from difficulty. By the 12th section, a Court of Chancery is authorized to decree a sale of lands where an infant "has a joint interest therein, or interest in common with any other person or persons," where it shall appear to the Court that such sale will be for the interest and advantage of the parties. The words "joint interest" are not to be construed technically as meaning only an estate in joint tenancy, but includes estates in coparcenary; they are interests held jointly with other persons, within the meaning of the statute. This construction appears more obvious when we examine the Acts of 1831, ch. 311, and 1839, ch. 23, which are in *pari materia* with the Act of 1785. By the 7th section of the Act of 1831, the provisions of the 12th section of 1785, ch. 72, are extended to cases where all the parties are adults, and authorizes the sale of any interest or estate "held jointly or in common, or *otherwise* concurrently." The Act of 1839 authorizes the sale of any lands or real estate held jointly by any persons. These Acts are to be construed together, and confer upon Courts of Chancery the power to decree the sale of any interest in lands when it shall appear for the interest of all parties holding the same *jointly,* whether they hold by descent or by purchase. *Bolgiano vs. Cook,* 19 *Md. Rep.,* 376.

The proceedings in this case being instituted under and in conformity with the provisions of the Act of 1785, the Court had the jurisdiction and authority to pass the original decree, upon proof of the allegations of the bill, without pursuing the course prescribed by the Act of 1820, ch. 191. This Act and the Act of 1785, and its supplements, are not in *pari materia;* but are altogether distinct from each other, and the jurisdiction and proceedings under them, respectively, are wholly distinct and dissimilar.

A majority of this Court are also of opinion that the bill of review ought not to be sustained upon any of the grounds

relied on in the argument of the appellees in this Court. The general principles governing the subject of bills of review, are stated by the Court in *Tomlinson vs. McKaig;* without repeating them here, in our opinion the bill of review in this case and the proof adduced in its support, do not show any sufficient grounds for rescinding the decree, either by reason of error or irregularity on the face of the proceedings, or on account of any newly discovered facts. The decree of the Circuit Court, passed on the 6th day of August 1862, rescinding the decree of the 3rd of February 1849, must therefore be reversed.

With reference to the order of the Circuit Court, setting aside the sale made to the appellant, we concur in the opinion expressed by the Chief Justice, and will sign a decree affirming that order, and remanding the cause. The costs of this appeal to be paid by the appellant.

*Affirmed in part, and reversed in part,*

*and cause remanded.*

(Decided May 12th, 1865.)