LEWIS C. MERRYMAN, TRUSTEE, ET AL.
*v.* BREMMER

[No. 165, September Term, 1967.]

*Decided May 10, 1968.*

The cause was argued before HAMMOND, C. J., and HOR-NEY, BARNES, FINAN and SINGLEY, JJ.

*Raymond S. Smethurst, Jr.,* with whom were *Adkins, Potts & Smethurst* on the brief, for appellants.

Submitted on brief by *Henry P. Walters* for appellee.

BARNES, J., delivered the opinion of the Court.

The important facts in what Judge Prettyman in his opinion in the lower court characterized as "this ancient and extended proceeding" began on November 30, 1934, when the Circuit Court for Worcester County, in equity, signed a decree appointing the appellant, Lewis C. Merryman, trustee to make a sale of the real estate of "Captain" William B. S. Powell who had died testate in Worcester County on October 8, 1933. Captain Powell's personal estate was not sufficient to discharge all of his debts, and his creditors petitioned the Circuit Court for Worcester County to sell as much of the decedent's real estate as might "be necessary * * * to pay the claims of * * * creditors of the deceased." Captain Powell had provided in his will

dated August 21, 1933, and duly admitted to probate, for the creation of a trust of all of his real estate and designated his daughter, M. Elizabeth Powell (Elizabeth), as trustee of this trust. She was also named as executrix of Captain Powell's will. By the terms of the will the real estate was to be held for five years, with the income payable one-third to Mrs. Powell, the decedent's widow, 10% of the remaining two-thirds to another legatee and the residue to Elizabeth. When the real estate was sold (at the end of the five year period or sooner in the discretion of the trustee under the will), the corpus was to be distributed in the same proportions and to the same persons as designated for the payment of the income. After Merryman qualified as trustee to sell he arranged a large sale of Ocean City real estate owned by the decedent on August 22, 1936. Approximately 150 lots were sold on that day, E. T. Newell & Co., Inc. (Newell), a Baltimore auctioneering company, conducting the sale for the trustee, Merryman. At this auction sale each purchaser of a lot executed in triplicate a written purchase contract in which the purchaser agreed to pay the amount bid according to the "terms announced at this sale," waived "all homestead rights and exemptions" and agreed to pay a 10% attorneys fee "in the event I am sued on this contract." One copy of the contract of sale was delivered to the purchaser, one copy was delivered to Merryman as trustee and the remaining copy was retained by Newell. A master chart of all sales was maintained by Newell and the original was delivered to Merryman, as trustee, when the auction sales were concluded. The terms of sale as decreed and as advertised required a purchaser to pay "one-third cash on the day of the sale and the balance in twelve months or all cash at the option of the purchaser."

On the day of the auction the appellee, Fred G. Bremmer, sales manager for the Myerhoff Company, Baltimore real estate developer, was at Ocean City and was attracted by the ringing of the auctioneer's bells. Unsolicited, he walked to the site of the auction and successfully bid on Lots 7 and 8, Block 87 North, for $195, executed a purchase contract and gave a $100 check as a down payment. Bremmer was living at that time at 6029 Gwynn Oak Avenue in Baltimore City with his wife Anne S. Bremmer.

4

Merryman, as trustee, filed on September 2, 1936, in the Circuit Court for Worcester County, his Twentieth Report of Sale in which he listed all of the sales made at the auction on August 22, 1936, including the two lots sold to Bremmer. The report of sale, however, reported the sale lots as follows: "Fred A. *Tremerer* of Baltimore, Maryland for the sum of $195.00." (Emphasis supplied.) The usual order nisi was issued and published, and the Twentieth Report of Sale was *finally ratified* and confirmed by the Circuit Court on September 25, 1936.

On September 21, 1936—approximately one month after the auction sale—Merryman, having misconstrued the signature on the contract of sale, wrote the appellee under the name of "Tremerer" at the Gwynn Oak Avenue address to advise the purchaser that the sale would be finally ratified shortly and to request the balance of $95.00 due on the sales contract. Having received neither a return of the letter nor an answer to it, Merryman again wrote "Fred G. *Tremerer*" on October 26, 1936, at the same address advising that the sale had been finally ratified and requesting advice "as to when and how you will make settlement." Again the letter was not returned and no answer was received. Merryman again wrote "Fred G. *Tremerer*" at the same address on January 12, 1937, and again on May 3, 1937, requesting settlement. The last letter had been sent by registered mail, with a return receipt requested. The return receipt returned to Merryman disclosed that the letter had been received by "Anne S. Bremmer," wife of the appellee. Merryman then became aware of the correct spelling of the purchaser's name and Merryman's next letter was sent in the correct name at the Gwynn Oak Avenue address advising Bremmer that he was in default on the contract. Merryman testified that he received no return of this letter and no answer to it.

Thereafter Merryman sought the assistance of Newell to communicate with Bremmer and on August 6, 1937, Newell wrote Merryman that in accordance with this request Newell had called on "Fred G. Tremmer at the Gwynn Oak Avenue address" and had been "informed by him that he is going to make arrangements with you to take up the balance due upon the lots he purchased." On August 17, 1937, Bremmer wrote Merryman stating that Newell had communicated with him relative to

the lots purchased by Bremmer, requested "the figures in order to satisfy the balance due" and stated that he would "forward you my check in payment." Merryman wrote back to Bremmer on August 21, 1937, advising that the amount due was $106.10, consisting of the balance of $95.00, interest of $5.70, taxes of 15¢ per lot or 30¢ for taxes and $5.25 for the deed and notary fee. Merryman wrote Bremmer on September 22, 1937, that he had written on August 21 in regard to the amount due on the lots purchased by Bremmer and that Bremmer "had promised to send me this amount at once and although a month has passed I have heard nothing from you. As I informed you before, I cannot keep this matter open indefinitely and unless I hear from you by Saturday * * * will proceed to have the lots resold at your expense. Please add 48 cents interest to the amount I gave you."

Having received no reply to the letter of September 22, Merryman wrote Bremmer on September 28, 1937, advising him that he was in default, that the balance due was $95 with interest of $6.37 to October 2, and unless the full amount was paid by October 2, 1937, "It will be my duty as trustee to resell at your expense the lots which you purchased and I will proceed immediately after that date to do so. If you make settlement by that date, please include in the above amount 15¢ per lot or 30¢ for taxes and send check for $5.25 for deed and notary fee." No reply was received by Merryman to this letter, although the return receipt revealed that "Mrs. F. G. Bremmer" had received the letter on September 29, 1937.

Sometime between September 29, 1937, and 1938 or 1939, Bremmer moved from the Gwynn Oak Avenue address and finally Elizabeth, on July 2, 1940, wrote Merryman that Bremmer was now living at 3401 Lake Montebello Drive in Baltimore. Merryman wrote Bremmer at the new address but apparently received no reply.

Between 1940 and 1959, Merryman testified, he attempted a number of times to locate Bremmer, but was unable to do this. He testified that he checked for telephone listings in the Bremmer name when he was visiting his sister in Baltimore, and stated that the Bremmers were not listed from 1938 to 1949. This absence of listing is disputed by Bremmer. Merryman

was unable to locate Bremmer in the Baltimore City directory (although he was listed from 1949 through 1956) apparently because he looked at the Baltimore *County* directory owned by his sister rather than at the Baltimore *City* directory. Merryman testified that he attempted to locate Bremmer at his work through his brother-in-law who worked for Myerhoff, but although he visited a number of job sites of the Myerhoff developments, he was unable to locate Bremmer.

In either 1958 or 1959 Elizabeth and representatives of beneficiaries of the Powell trust concluded that because of Bremmer's non-payment they owed him no further obligation and they urged Merryman to conclude the matter. Merryman located a telephone listing for Bremmer in Cockeysville and thereafter went to the Bremmer home to discuss the matter with Bremmer and "find out what he was going to do." There is a conflict in the testimony in regard to what happened at this meeting. Merryman indicated that although he did not show Bremmer his file, he was sure that he told Bremmer what was due and owing, but Bremmer did not indicate that he would pay the balance due. Bremmer, on the other hand, testified that Merryman asked him if he was able to consummate the deal, to which Bremmer replied "Yes, we can well afford it. How much is it?" Merryman said he couldn't tell but "would write us a letter and tell us about it," but he never did write. Bremmer and his wife Anne had been divorced and Bremmer married his present wife, Margaret T. Bremmer, in 1945. The present Mrs. Bremmer was present at the meeting in 1958 or 1959 and confirmed her husband's account of what happened at that meeting.

On August 22, 1960, Merryman, as trustee, filed a petition to set aside the sale to Bremmer. After receiving service of this petition and the show-cause order issued pursuant to it, Bremmer and his wife drove to Salisbury in late August or early September, 1960, to see Merryman. Here again the accounts of what happened differ. Merryman testified that Bremmer wished to settle the matter, arrange for a sale and a division of the net proceeds. Bremmer denied this and testified that Merryman refused to discuss the matter. After the brief visit to Merryman, Bremmer went to Ocean City and was introduced to William

G. Kerbin, Jr., a member of the bar who, after discussion of the matter with Bremmer, called Merryman a few days later and told him that Bremmer "was willing and able to pay the balance if he knew how much it was." He could not recall what Merryman's reply was. The Chancellor resolved the conflicts in the testimony in favor of Bremmer and it is apparent that we should not hold that his findings were clearly erroneous. Maryland Rule 885 a.

Merryman admitted that as a lawyer he understood that Bremmer had equitable title to the two lots after the final ratification of the sale. Bremmer testified that he had no recollection of seeing the Merryman letters, although he would not deny that they might have been delivered at the address to which they were sent. He explained that he had done nothing prior to the filing of the petition on August 22, 1960, because the lots were not "one of the more important matters." The taxes on the two lots were paid by Merryman, as trustee, until 1948, and thereafter by Elizabeth, as trustee.

The Chancellor, in a well-reasoned written opinion, decided that it was the duty of Merryman, as trustee, to take the initiative to use the remedies given by law in the event of default by a purchaser at a judicial sale, and since the trust would not suffer loss by the perfection of the purchaser's title at the present time, this should be done. In a decree of March 7, 1967, the Chancellor directed Merryman, as trustee, to file an account of taxes paid on the two lots with the date of payment and within 30 days thereafter Bremmer should pay to Elizabeth, as trustee, the balance of $95, the amount of taxes paid by the trustees with interest on the amount of taxes at 6% per annum from the respective dates of payment, and upon such payment, Merryman and Elizabeth, as trustees, should execute a deed for the two lots to Bremmer upon presentation of the deed by Bremmer or his counsel. After the overruling of the motion of Merryman and Elizabeth for a new trial (Elizabeth had been authorized to intervene as a party petitioner), the appellants took a timely appeal to this Court from the decree of March 7, 1967.

The appellants make three contentions:

1. Bremmer has defaulted on his contract and is barred by laches from enforcing any claim to title to the two lots.

8.

2. Bremmer abandoned his interest in the two lots.

3. If the sale is enforced, Bremmer should be required to pay all court costs, attorneys' fees and trustees' commissions, in addition to the balance due, taxes and interest on the tax payments.

In our opinion all three contentions are without merit and the decree will be affirmed.

1.

The sale involved in the present case is a judicial sale of real estate and not a conventional sale. Our predecessors have established the rights of the parties when land is sold at a judicial sale. A sale made by order of court is an executory contract, subject to the filing of exceptions. *Hunting v. Walter*, 33 Md. 60 (1870). The court itself is the vendor, the trustee being merely the agent of the court to carry into effect the order of court directing the sale, and upon final ratification of the sale by the court the contract of purchase becomes complete. *Lurman v. Hubner*, 75 Md. 268, 23 A. 646 (1892). When the sale is finally ratified, the purchaser's inchoate equitable title, acquired at the time of the acceptance of his offer by the trustee, becomes complete and the purchaser's equitable title is established retroactively to the time of the original acceptance of the offer by the trustee. The purchaser is entitled to the rents and profits of the land sold as he has become the substantial owner of the property. He is not only entitled to possession of the property, but it remains at his risk, even though legal title may not be conveyed. *Farmers' Bank v. Clark*, 28 Md. 145 (1868). Miller, *Equity Procedure* §512, page 604 (1897). If the land appreciates in value that benefit accrues to the purchaser; if it depreciates in value that is the purchaser's loss. The purchaser is entitled to maintain his equitable title as the substantial owner of the land until he is divested of it as provided by law. The legal procedures to accomplish such divesting are well established.

When the sale was finally ratified in 1936, Article 16, Section 239 of the 1924 Code of Maryland was in effect. It provided:

"The court shall have full power and authority, on application by bill or petition of the trustee appointed

by said court to sell real estate, to compel the pur-
chaser thereof to comply with all or any of the terms
of such sale, by process of attachment or other exe-
cution suited to the case; or the said court, upon such
application, may direct the property purchased to be
re-sold, at the risk of such purchaser, upon such terms
as the court may direct; and in such case, if the pro-
ceeds of the re-sale, after payment of the expenses
thereof and of all costs of proceeding, shall not be equal
to the payment of the purchase money originally bid
therefor, the court may order and direct the differ-
ence to be paid by the said purchaser, and enforce such
order by execution."

Merryman, as trustee, should have proceeded in accordance
with these provisions after it appeared that the balance due from
the purchaser, Bremmer, was not paid in accordance with the
terms of the sale as finally ratified and confirmed by the court.
Article 16, Section 239 of the 1924 Code became Article 16,
Section 163 of the 1957 Code with substantially the same pro-
visions. Article 16, Section 163 was repealed by Chapter 36,
§1 of the Laws of 1962, and thereafter the provisions of Mary-
land Rule BR 6 c controlled the procedure in the event of de-
fault by purchasers at judicial sales subsequent to final ratifi-
cation. Rule BR 6 c provides:

"In case of default by the purchaser in a sale re-
ported to the court, the court, on application, and after
notice to the defaulting purchaser, may order a resale
at the risk and expense of such purchaser, or may take
such other action as justice may require."

Merryman was not only charged with knowledge of these
applicable provisions of law but his correspondence with Brem-
mer discloses that he had actual knowledge of them and threat-
ened to use the well-established procedure of re-selling the land
at the purchaser's risk if payment of the balance due were not
made. The duty of the trustee was clear. The procedure was
well established and effective. As the Chancellor indicated in
his opinion, the duty was on the trustee to proceed as required

by law and the trust estate cannot obtain any advantage at the expense of the purchaser by the trustee's failure to do this. It is quite true, as urged by the appellants, that Bremmer, as purchaser, was dilatory in paying the balance due, but the confusion of names, the probability that much of Merryman's correspondence may not have reached Bremmer, although delivered to his then address, and the inability of Bremmer to obtain a figure of the amount due from Merryman tend to mitigate Bremmer's failure to pay the balance due. There is no question from the evidence that Bremmer was at all times *able* to pay the relatively small amount involved and the evidence sustains the Chancellor's conclusion that he was ready and willing to pay the balance when the amount of that balance was given him. The delay, therefore, must be attributed to the trustee, Merryman, and not to Bremmer.

In any event, the delay did not result in any detriment to the trust estate which upon receiving the balance due, together with reimbursement for taxes paid, with interest on the amount of those taxes, is in the same position as it would have been had the delay not occurred. In addition to the requirement of an unreasonable delay, the change of position to the injury of the person asserting laches must be established, as the doctrine is in the nature of an equitable estoppel. *Kaufman v. Plitt,* 191 Md. 24, 29, 59 A. 2d 634, 636 (1948). See *Parker v. Board of Election Supervisors,* 230 Md. 126, 130, 186 A. 2d 195, 197 (1962) ; see also 2 Pomeroy, *Equity Jurisprudence* (Fifth Ed. 1941), §419 d, pages 177-180. The appellants cannot under the circumstances of this case avail themselves of the doctrine of laches in seeking to set aside the judicial sale after final ratification.

Reliance is placed by the appellants on the decision in *Billingslea v. Baldwin,* 23 Md. 85 (1865). In our opinion, this reliance is misplaced as the case is distinguishable from the case at bar. In *Billingslea* the sale of a remainder in fee expectant upon a life estate was sold at a judicial sale. Billingslea, the purchaser, *prior to final ratification,* failed to comply with the terms of sale for four years, was absent from the State for part of that time, declared he would not take the land unless the title was guaranteed, and left the property exposed to destruction by fire, flood or accident. After the death of the life tenant—the

property in the meantime having appreciated four-fold in value —the purchaser, without advising the trustee of the life tenant's death, paid the purchase money and claimed the benefit of his bid. The lower court passed a decree declining to *finally* ratify the sale and setting aside the purported sale. This decree was affirmed on appeal. The most important distinction between *Billingslea* and the present case is that in *Billingslea* there was *no final ratification* of the sale, but in the present case there was such ratification. Secondly, the circumstances in regard to the delay, the conduct of the purchaser and the change of position were quite different in the *Billingslea* case from those in the case at bar.

### 2.

There was no abandonment by the purchaser of the sale of the two lots. As Judge Markell, for the Court, stated in *Dorman v. Mayor and City Council of Baltimore,* 187 Md. 678, 684, 51 A. 2d 658, 661 (1947) :

> "Abandonment depends upon concurrence of two factors, (a) an intention to abandon and (b) some overt act, or failure to act, which carries the implication that the owner does not claim or retain any interest in the subject matter. Time is not an essential element, but may be evidence of intention to abandon and may be considered in connection with acts manifesting such an intention."

It is clear to us that the facts found by the Chancellor and supported by the evidence indicate no intention to abandon the sale by Bremmer. He was not greatly interested in what originally was thought by him to be a relatively unimportant matter, but the evidence supports his position that he was always ready, willing and able to pay the balance due when he could obtain a definite figure of that balance from Merryman, as trustee. In short, no *intention* to abandon by the purchaser was established and the purchaser did no overt act from which such an intention might have been inferred.

### 3.

The appellants urge upon us that the well-established maxim that "He who seeks equity, must do equity" requires that in

addition to the payment of the balance due and the taxes with interest from the time of their payment by the trustees, the purchaser should, in any event, be required to pay all court costs, counsel fees and trustee's commissions based upon the present value of the two lots. It is contended that the situation in the present case is analogous to that in a case involving a re-sale at the risk of a defaulting purchaser. See *State v. Hoboken Bank,* 84 Md. 325, 327, 35 A. 889, 890 (1896). In the present case, however, no resale at the purchaser's risk is involved and it is apparent, as we have indicated, that the purchaser is ready, willing and able to comply with the terms of the sale as required by the decree in this case. The reimbursement of the trustees for taxes paid by them, with the legal rate of interest from the time of payment, is the only equitable relief to which the appellants are entitled resulting from any delay by Bremmer in paying the balance due.

*Decree affirmed, the costs to be paid by the appellants.*