William KEARNS, Appellant,

v.

McNEILL BROTHERS MOVING AND
STORAGE COMPANY,
INC., Appellee.

No. 84–1703.

District of Columbia Court of Appeals.
Argued Jan. 14, 1986.
Decided May 27, 1986.

Frederic R. Kellogg, Washington, D.C., for appellant.

Patricia E. Ricks, Washington, D.C., for appellee.

Before NEWMAN and TERRY, Associate Judges, and PAIR, Senior Judge.

TERRY, Associate Judge:

Appellant Kearns sued appellee McNeill Brothers Moving and Storage Company, Inc. (McNeill), alleging that McNeill had negligently stored, and later converted, $37,000 worth of his property.[1] Kearns further claimed that McNeill had violated several provisions of Article 7 of the Uniform Commercial Code (UCC), D.C.Code §§ 28:7–101 through 28:7–603 (1981 & 1985 Supp.), in its enforcement of a warehouseman's lien. In a non-jury trial, the court dismissed the complaint at the close of the plaintiff's case on the ground (not asserted by McNeill) that Kearns had abandoned his property.

On appeal from the order of dismissal, Kearns makes three arguments. First, he contends that the trial court erred in ruling that the statute of frauds barred recovery because of his failure to introduce a warehouse receipt. We need not consider this claim, however, because the record clearly shows that the court gave Kearns the benefit of the doubt on that issue.[2] Second,

---

1. The complaint originally included claims against both McNeill and Adam A. Weschler & Son, Inc., an auction firm which McNeill had hired to sell the stored goods at a public auction. The claim against Weschler, however, was settled before trial. Weschler is not a party to this appeal.

2. In dismissing the case, the court said it would "assume that there was an oral contract [which was] taken out of the statute of frauds by partial payment...."

Kearns challenges the court's finding that he abandoned his property. Third, Kearns maintains that the court erred in not considering the evidence in support of his allegations that McNeill violated several provisions of the UCC. We agree with the second and third arguments, and hence we reverse the trial court's order.

## I

In 1974 William Kearns placed several items of personal property in storage with McNeill at its warehouse in Northeast Washington, agreeing to pay a storage charge of $25 per month. Although he did not recall receiving a warehouse receipt, Mr. Kearns did receive from McNeill a document entitled "Household Goods Descriptive Inventory," which listed in general terms the items that were stored and their condition at the time of storage. The inventory stated no value for any of the items, which included several pieces of furniture, some artwork, four small cartons, a small keg, and fifty-five shopping bags containing "mostly books." Mr. Kearns, however, alleged in his complaint that the goods were worth approximately $37,000. The list was signed by Philip S. McNeill, who was apparently an officer of the company, but Mr. Kearns did not sign it because he questioned the accuracy of the stated condition of the goods. Many of the items were listed as soiled, badly worn, broken, or chipped, which Kearns disputed.[3]

Mr. Kearns later moved to Baltimore and then to New York, where he currently resides. He testified that he regularly informed McNeill of his changes of address. He also said that he "was billed sporadically" for the storage charges. Initially, he received a bill once every two months, but eventually the bills came every four to five months. When billed, Mr. Kearns usually paid part of the balance, leaving a portion of the balance due.

On one occasion in 1976, Mr. Kearns telephoned McNeill to find out how much he then owed. To his surprise, he testified, he received "a threat that they were going to sell my things" if he did not pay his entire outstanding balance. His fears were soon alleviated, however, when Mr. McNeill, with whom he had previously dealt, told him to ignore the "threat," that his son (who made it) did not know the situation, and that Mr. McNeill "knew [Kearns] was good for paying the money."

Mr. Kearns' last payment, a check for $250.00, was received by McNeill on December 13, 1978. This payment left a balance due of $250.00. The check was accompanied by a letter, dated December 8, which stated:

Dear Mr. McNeill:

How are my "Precious" belongings? Would it be possible on my next visit to Washington to get into my things and remove a photograph that my mother has been hounding me about? I now have a small, and I do mean small, apartment on Park Avenue and when and if I finally find something large enough, I will remove my stuff. In the meantime, I hope all is well.

Sincerely,

/s/ William Kearns

P.S. How much do I now owe?

In March 1980 Mr. Kearns called McNeill to find out how much he then owed, intending at that time to pay the balance due and remove the goods from storage. To his dismay, he was informed that he owed nothing because his goods had been sold in satisfaction of his account. Mr. Kearns testified that he knew nothing of the sale before that telephone conversation, although during discovery he "found that they had sent me a registered letter." The letter, however, was not addressed to Mr. Kearns, nor did it indicate anywhere on its face that it was intended for him;[4] he testified, in fact, that he never received it.

---

3. Kearns did not question the completeness of the list.

4. See note 8, *infra*.

The goods were sold for $1,090.00 at a public auction conducted by Adam A. Weschler & Son, Inc., in August 1979. After deducting its commission and advertising expenses, Weschler delivered $764.70 to McNeill. From that amount McNeill took $450.00 in satisfaction of the balance due on the storage charges and sent the remainder, $314.70, to Mr. Kearns in December 1980.

Mr. Kearns introduced into evidence two handwritten lists of the items he had placed in storage with McNeill. These lists, prepared by Mr. Kearns in 1981 or 1982, stated the approximate condition of the goods, the purchase price and approximate date of purchase for most of the items, and his own estimate of the value of each item. He also introduced a copy of the original Household Goods Descriptive Inventory, on which was written "Short 6 pieces, 8/2/79, John Weschler." In addition, a list of all the items sold at auction was admitted into evidence. Mr. Kearns testified, however, that the list was incomplete; in particular, "[t]here are all kinds of items—such as linens, gold watches, silver, architectural drawings, books, that are not accounted for at all."

Finally, Mr. Kearns presented testimony from John S. Pearson, an estate appraiser whom the court accepted as an expert witness. Mr. Pearson testified that, in his opinion, the total value of the goods placed in storage by Mr. Kearns was $46,440.00. His determination was based "on the condition as described by the plaintiff, and also a fair market value as of the date of this description."

At the close of the plaintiff's case, counsel for McNeill moved for a directed verdict "on the grounds that the plaintiff has not made out a prima facie case. He does not have the receipt showing the contract, and that is necessary in order to establish that this was a lien that the warehouseman ... was seeking to enforce, and any complaint alleging that the lien was not proper would necessitate the warehouse receipt, at the very, very least." The court granted the motion, but for a different reason, which had not been asserted by McNeill. It ruled that because Mr. Kearns had not made any monthly payments between December 1978 and the sale of the goods in August 1979, he had "abandoned" his goods: "The defendant assumed that the goods had been abandoned and [it] had the right to have the goods sold as abandoned property."

## II

Because this was a non-jury trial, the trial court's purported grant of a "directed verdict" was a misnomer. The court's ruling must be treated as an involuntary dismissal pursuant to Super.Ct. Civ.R. 41(b). *Bay General Industries, Inc. v. Johnson*, 418 A.2d 1050, 1054 (D.C.1980); *Marshall v. District of Columbia*, 391 A.2d 1374, 1379 (D.C.1978); *Keefer v. Keefer & Johnson, Inc.*, 361 A.2d 172, 174 (D.C.1976). This means that on appeal the trial court's factual findings will not be disturbed unless they are clearly erroneous. *Marshall v. District of Columbia, supra*, 391 A.2d at 1379–1380; *see* D.C. Code § 17–305(a) (1981). Moreover, in contrast to a defendant's motion for directed verdict, which requires that the evidence be viewed in the light most favorable to the plaintiff, a Rule 41(b) motion does not compel the trial court to consider the plaintiff's evidence as true. *Marshall v. District of Columbia, supra*, 391 A.2d at 1379; *Keefer v. Keefer & Johnson, Inc., supra*, 361 A.2d at 175. Rather:

[If the court] finds that the evidence does not preponderate in plaintiff's favor, the court can enter judgment for the defendant. Thus, if there is insufficient credible evidence to sustain each element of plaintiff's claim, or if, despite such credible evidence, a valid defense is evident from plaintiff's own case, judgment for the defendant is justifiable.

*Marshall, supra*, 391 A.2d at 1379.

In this case the trial court erred in ruling that the defense of abandonment was established by the plaintiff's own evidence and in granting the defendant's Rule 41(b)

motion. "Abandoned property is that to which the owner has voluntarily relinquished all right, title, claim, and possession, with the intention of terminating his ownership, but without vesting it in any other person and with the intention of not reclaiming future possession or resuming its ownership, possession, or enjoyment." 1 AM.JUR.2D *Abandoned, Lost, and Unclaimed Property* § 1, at 3–4 (1962) (footnotes omitted). The owner must have "utterly and entirely relinquished" all hope and intent of recovering the property. *Id.* at 4 (footnote omitted). Moreover, "there must be a clear and unequivocal intent to abandon on the part of the owner, and the burden is on him who alleges abandonment to establish that intent." *International Finance Corp. v. Jawish*, 63 App.D.C. 262, 263, 71 F.2d 985, 986 (1934) (citations omitted); *accord, Friedman v. United States*, 347 F.2d 697, 704 (8th Cir.), *cert. denied*, 382 U.S. 946, 86 S.Ct. 407, 15 L.Ed.2d 354 (1965); *Linscomb v. Goodyear Tire & Rubber Co.*, 199 F.2d 431, 435 (8th Cir.1952) ("Proof of abandonment must be made by the one asserting it by clear, unequivocal and decisive evidence"); *see Peyton v. United States*, 275 A.2d 229, 230 (D.C. 1971).

■ Appellee McNeill made no claim of abandonment at trial, nor does it argue on appeal that Mr. Kearns abandoned his property. Only the trial court seems to have come to that conclusion, despite the fact that there was not a scintilla of evidence to support it. Although the court believed that Mr. Kearns' failure to make payments for an eight-month period was sufficient to prove that he abandoned his property, the evidence showed that he always paid sporadically and that McNeill never objected to the irregularity of his payments. During one stretch Mr. Kearns failed to pay anything for over a year, from August 1974 to September 1975. Thus there was nothing unusual in his failure to make a payment for eight months; it certainly does not establish an intent to abandon.

To the contrary, the evidence strongly suggests that Mr. Kearns did not intend to abandon his property. In the letter he wrote to McNeill on December 8, 1978, he stated that "when and if I find [an apartment] large enough, I will remove my stuff.... P.S. How much do I now owe?" This letter is strong evidence of Mr. Kearns' intention not only to continue storing his goods with McNeill but also to pay the accrued storage charges. Kearns' telephone call to McNeill in March of 1980 to determine how much he then owed was another act inconsistent with an intent to abandon the property. Moreover, the burden was on McNeill to prove that Kearns clearly and unequivocally intended to abandon his goods; it made no attempt to do so, however, for it did not raise abandonment as a defense. Thus the court erred in granting appellee's Rule 41(b) motion on the ground of abandonment. *See Goins v. United States*, 475 A.2d 362, 365 (D.C. 1984) ("There was no evidence that either of the two owners intended to abandon their cars since they both reported as a theft the disappearance of their cars"); *Peyton v. United States, supra*, 275 A.2d at 230 (no evidence of abandonment "other than defendants' testimony that they thought the property had been abandoned"); *Block v. Fisher*, 103 A.2d 575, 576 (D.C.1954) ("there must be an intent to abandon and an act or omission by which such intention is put into effect"); *International Finance Corp. v. Jawish, supra*, 63 App.D.C. at 263, 71 F.2d at 986 (abandonment not established when party alleging it "fail[s] to offer any substantial evidence in support of that claim"); *Friedman v. United States, supra*, 347 F.2d at 704–705; *Merryman v. Bremmer*, 250 Md. 1, 11, 241 A.2d 558, 565 (1968).

### III

Having determined that Mr. Kearns abandoned his property, the trial court apparently believed there was no need to determine whether McNeill complied with its duties as a warehouseman under Article

7 of the UCC. McNeill now asserts that its Rule 41(b) motion was properly granted, regardless of the reasons given by the trial court, because appellant failed to make out a prima facie case on any of his Article 7 claims. We disagree.

■ Initially we note that any failure by appellant Kearns to produce a warehouse receipt would not take the case out of Article 7. In the first place, a warehouse receipt is defined in the UCC simply as "a receipt issued by a person engaged in the business of storing goods for hire." D.C. Code § 28:1–201(45) (1981). The "Household Goods Descriptive Inventory" which Kearns introduced into evidence fits that definition, and accordingly we hold that it was a warehouse receipt within the meaning of the UCC. Furthermore, "[a] warehouse receipt need not be in any particular form." D.C.Code § 28:7–202(1) (1981). "The obligations imposed by this article on an issuer apply to a document of title regardless of the fact that ... the document may not comply with the requirements of this article or of any other law or regulation regarding its issue form or content...." D.C.Code § 28:7–401 (1981).[5] The failure to issue a proper warehouse receipt, or the issuance of an irregular document, does "not limit the scope of Article Seven so far as the *obligations of an issuer* are concerned, even though a speci-

fied key definition, such as 'document' or 'warehouseman,' is not satisfied." J. WHITE & R. SUMMERS, UNIFORM COMMERCIAL CODE § 20–2, at 784 (2d ed. 1980) (emphasis in original).[6] This is so because Article 7 is intended to have "considerable displacing effect" on the general law governing the liability of ordinary bailees of personal property. *Id.* at 784–785.

■ In any event, McNeill qualifies as a "warehouseman" under the UCC because it is "engaged in the business of storing goods for hire." D.C.Code § 28:7–102(1)(h) (1981). McNeill was therefore required to exercise the care of a "reasonably careful [person]" under section 28:7–204(1), which imposes such a standard of care on a warehouseman without regard to whether the document issued by the warehouseman (in this case, the Household Goods Descriptive Inventory) is itself a "warehouse receipt."[7] Kearns presented evidence that some of his goods were unaccounted for. In particular, the copy of the Household Goods Descriptive Inventory that was apparently given to the auctioneers by McNeill, which Kearns had obtained through discovery, contained the handwritten notation, "Short 6 pieces, 8/2/79, John Weschler." This was at least prima facie evidence that six items were missing from the lot sold at auction. In addition, Mr. Kearns testified

---

5. An "issuer" is defined, with an exception not pertinent here, as "a bailee who issues a document...." D.C.Code § 28:7–102(1)(g) (1981). As used in Article 7, the word "document" means a document of title as defined in D.C. Code § 28:1–201(15) (1981); *see* D.C.Code § 28:7–102(1)(e) (1981). Since that definition includes a warehouse receipt, the Household Goods Descriptive Inventory in this case, being a warehouse receipt, is also a document of title.

6. Indeed, D.C.Code § 28:7–202(2) (1981) imposes liability on a warehouseman for damages resulting from the omission from a warehouse receipt of certain specified provisions. Hence it is the warehouseman-bailee, not the bailor, who would be aided by the existence of a proper warehouse receipt (*i.e.,* one that includes all the provisions listed in section 28:7–202(2)) and by its introduction into evidence. Moreover, damages for any breach of a warehouseman's duty of care may appropriately be limited by the

terms of the warehouse receipt. D.C.Code § 28:7–204(2) (1981). By failing to produce the receipt, the warehouseman risks losing the benefit of any limitation of liability that it may contain.

7. D.C.Code § 28:7–204(1) (1981) provides:

A warehouseman is liable for damages for loss of or injury to the goods caused by his failure to exercise such care in regard to them as a reasonably careful [person] would exercise under like circumstances but unless otherwise agreed he is not liable for damages which could not have been avoided by the exercise of such care.

Under section 28:7–204(2), the amount of the warehouseman's liability "may be limited by a term in the warehouse receipt or storage agreement," *see* note 6, *supra,* but the limitation does not depend on whether the limiting document is a proper warehouse receipt.

that several other stored items did not appear on the auction list. McNeill offered no explanation for their absence.

■ In cases in which the warehouseman cannot explain what happened to the goods, the courts tend to impose liability. *E.g., Bean v. Security Fur Storage Warehouse, Inc.*, 344 Mass. 674, 184 N.E.2d 64 (1962) (fur coat left with bailee for cleaning and storage inexplicably lost); *D.H. Overmeyer Co. v. Hirsch Bros. & Co.*, 459 S.W.2d 598 (Ky.1970) (unexplained loss of 900 cases of pickles). That this is the correct result is explained by White and Summers: "In the usual case the warehouseman will have far better access to the facts than the plaintiff, and he should have to explain how the loss or damage occurred and why he was not negligently responsible." J. WHITE & R. SUMMERS, *supra*, § 20–3, at 791. Therefore, at least as to the items not accounted for, we hold that Kearns made out a prima facie case of a breach of McNeill's duty of care under D.C.Code § 28:7–204(1). *See Joseph H. Reinfeld, Inc. v. Griswold & Bateman Warehouse Co.*, 189 N.J.Super. 141, 458 A.2d 1341 (1983) (customer of warehouse establishes a prima facie case by showing a bailment, a demand for return, and failure to return on demand); 7 R. ANDERSON, UNIFORM COMMERCIAL CODE § 7–204:8, at 480 (3d ed. 1985) ("A warehouseman not only has the duty to exercise due care but likewise he has the burden of explaining any loss or disappearance of the property bailed with him"); *see also Procter & Gamble Distributing Co. v. Lawrence American Field Warehousing Corp.*, 16 N.Y.2d 344, 360, 213 N.E.2d 873, 881, 266 N.Y.S.2d 785, 797 (1965) ("it is self-contradictory for a warehouseman simultaneously to assert due care and total lack of knowledge of what happened" to the goods).

## IV

As for the items that were accounted for, McNeill cannot be held liable for conversion or misdelivery if it disposed of the goods through the enforcement of a valid lien. D.C.Code § 28:7–403(1)(c) (1981). Under the UCC, a warehouseman automatically acquires "a lien against the bailor on the goods covered by a warehouse receipt or on the proceeds thereof in his possession for charges for storage or transportation. . . ." D.C.Code § 28:7–209(1) (1985 Supp.). The warehouseman has the right to sell the property to enforce its lien, but the sale must comply with the strict requirements of D.C.Code § 28:7–210 (1981). *See Hughes v. Accredited Movers, Inc.*, 190 N.J.Super. 71, 461 A.2d 1203 (1983). Kearns alleged in his complaint that McNeill committed at least three violations of section 28:7–210. Specifically, he charged that McNeill failed to give proper notice of the sale, failed to sell the goods in a commercially reasonable manner, and sold more goods than necessary to insure satisfaction of his indebtedness.

■ When a warehouseman is sued for conversion of goods that were stored in its warehouse, the burden is on the warehouseman to prove a valid foreclosure of its lien. *See Flores v. Didear Van & Storage Co.*, 489 S.W.2d 406 (Tex.Civ.App. 1972); 7 R. ANDERSON, *supra*, § 7–210:12, at 521. Willful failure to comply with section 7–210 constitutes a conversion. D.C.Code § 28:7–210(9) (1981); *see Bradford v. Muinzer*, 498 F.Supp. 1384, 1390–1391 (N.D.Ill.1980). In this case, because Mr. Kearns was not a merchant, McNeill was obliged to comply with the requirements of section 28:7–210(2), which provides in pertinent part that a lien on goods "other than goods stored by a merchant in the course of his business may be enforced only as follows":

(a) All persons known to claim an interest in the goods must be notified.

(b) The notification must be delivered in person or sent by registered or certified letter to the last known address of any person to be notified.

(c) The notification must include an itemized statement of the claim, a description of the goods subject to the lien, a demand for payment within a specified

time not less than ten days after receipt of the notification, and a conspicuous statement that unless the claim is paid within that time the goods will be advertised for sale and sold by auction at a specified time and place.

\* \* \* \* \* \*

(f) After the expiration of the time given in the notification, an advertisement of the sale must be published once a week for two weeks consecutively in a newspaper of general circulation where the sale is to be held. The advertisement must include a description of the goods, the name of the person on whose account they are being held, and the time and place of the sale.

■ Kearns testified at trial that he never received notice of the sale. The only evidence of notice was a copy of a letter dated April 18, 1979, which Kearns obtained during discovery. It is said to have been a registered letter, although nothing so indicates in the letter itself. Furthermore, the letter is not addressed to Mr. Kearns or, indeed, to anyone at all; only the name and address of McNeill Brothers appears in it.[8] The testimony of Mr. Kearns that he never received this letter, and that he telephoned McNeill in March of 1980, almost a year later, to inquire about his current balance, suggests that a reasonable trier of fact could find that he did not receive it. Nevertheless, the trial court found that the letter was sent, and there was evidence to that effect. Because this case comes to us on review of a Rule 41(b) dismissal, rather than a directed verdict, we cannot disturb that finding. *Bay General Industries, Inc. v. Johnson, supra,* 418 A.2d at 1054.

■ We hold, however, that the contents of the letter, even if it was sent to Mr. Kearns and received by him, were legally insufficient to give him notice of the sale. It contains neither "an itemized statement of the claims" nor "a description of the goods subject to the lien," as required by D.C.Code § 28:7–210(2)(c). The letter itself was thus prima facie evidence of McNeill's failure to comply with the statutory notice requirements. In addition, the public advertisement of the auction sale, which appeared in both the Washington Star and the Washington Post, did not include "the name of the person on whose account" the sale was being held— namely, appellant—in violation of D.C.Code § 28:7–210(2)(f). *See* 7 R. ANDERSON, *supra,* § 7–210:24, at 526 ("The consequence of defects in the advertising of the sale ... may result in imposing liability on the warehouseman unless the defect is so slight that it may be ignored"). Because Kearns presented prima facie evidence of McNeill's violations of section 28:7–210(2), the trial court erred in dismissing the case without considering his claim of inadequate notice.

■ Kearns also contends that McNeill failed to sell his goods in a "commercially reasonable manner," thus violating D.C. Code § 28:7–210(1). The evidence showed that the goods were sold for only $1,090,

---

8. The letter (Plaintiff's Exhibit 8) reads as follows:

April 18, 1979

McNeill Bros. Moving and Storage Inc.
1125 2nd Street, N.E.
Washington, D.C. 20002
Dear

We sincerely regret that previous communication regarding your past due storage bill for the amount of 350.00 have [*sic*] gone unanswered. It is now necessary for us to place a lien on your storage items for the amount pass [*sic*] due.

If the full amount of your pass [*sic*] due account is not received in our office within 10 days from the date of this letter, your goods will be advertised for sale for the money that is due and sold by auction at a specified time and place.

It is our desire to promptly handle this matter in a manner which will be equitable to all of us. You will find us with an open mind and a cooperative attitude toward our mutual efforts to bring your account up to date in a proper fashion.

Sincerely,
/s/ Aliser D. Lewis
Manager

although Kearns alleged that they were worth at least $37,000. Because he presented some credible, albeit weak, evidence that the goods were actually worth more than $46,000, Kearns at least has a colorable claim that the goods were not sold in a commercially reasonable manner. *See* 7 R. ANDERSON, *supra,* § 7–210:11, at 521 ("Where a warehouseman sells goods for a fraction of their value, it is not commercially reasonable"). The court erred in failing to consider this claim.

 Finally, a warehouseman is generally prohibited from selling "more goods than apparently necessary to be offered to insure satisfaction of the obligation...." D.C.Code § 28:7–210(1) (1981). The balance due on Mr. Kearns' account at the time of the sale was only $350.00, yet all of his goods in storage were sold at the auction, which yielded more than three times that amount. Whether McNeill sold more goods than apparently necessary is a question of fact. *Bradford v. Muinzer, supra,* 498 F.Supp. at 1389. "Rule 41(b) mandates that the court enter findings of fact and conclusions of law complying with Super. Ct.Civ.R. 52(a)," *Marshall v. District of Columbia, supra,* 391 A.2d at 1379, so that this court may have a clear understanding of the reasoning behind its decision. *See Keefer v. Keefer & Johnson, Inc., supra,* 361 A.2d at 176 n. 9. The trial court erred in not at least considering this claim, and in failing to make the requisite findings of fact and conclusions of law.

## V

In sum, we hold that the trial court erred in finding that appellant Kearns abandoned his property, because there was no evidence of abandonment or of an intent to abandon. The court further erred in not considering any of the evidence relating to appellee McNeill's alleged violations of D.C.Code §§ 28:7–204 and 28:7–210 (1981). We therefore reverse the Rule 41(b) dismissal and remand this case for a new trial.

At the retrial, McNeill must offer evidence of abandonment if it desires to assert that affirmative defense. In addition, assuming that Kearns' evidence is the same at the second trial as it was at the first, McNeill must prove its compliance with Article 7 of the UCC. Appellant Kearns has presented prima facie evidence of several violations, and no defense is apparent from the facts of record. Should the trier of fact find that McNeill violated any of the provisions of section 28:7–210, it must then determine whether the violations were willful, in order to ascertain whether McNeill is liable for conversion or merely for negligent failure to comply with the statutory requirements for sale, *see* D.C.Code § 28:7–210(9) (1981), and to assess the appropriate damages.

*Reversed and remanded.*