*Wonder City, LLC v. Ralph J. DiPietro, et al.*, No. 0311, September Term, 2024. Opinion by Getty, Joseph M., J.

**HEADNOTES:**

FORECLOSURE SALES – SURPLUS FUNDS – WASTE

The purchaser of real property at a foreclosure sale is entitled to a remedy if the purchaser can prove that the property's former owner committed voluntary waste following the foreclosure sale, while the former owner was still in lawful possession of the property, because such waste prejudices the purchaser's inchoate equitable interest in the foreclosed property.

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 0311

September Term, 2024

_____
_____

WONDER CITY, LLC

v.

RALPH J. DIPIETRO, *ET AL.*

_____

Berger,
Leahy,
Getty, Joseph M.
   (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Getty, J.
_____

Filed: December 22, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

Foreclosures of real property in Maryland are court actions governed by Section 14-103 of the Real Property Article of the Maryland Code and Maryland Rules 14-201 through 14-218. In a typical foreclosure, the property owner is in significant default. Once the foreclosure sale is ratified and the audit report presented to the court, there are generally no surplus funds remaining.

In the event that there are surplus funds, Maryland Rule 14-216(a) provides that, in the time between the foreclosure sale and the final ratification of the auditor's account, any person with an interest in the property or the proceeds from the sale may file an application for payment of that person's claim from the surplus funds. The Rule then directs the court to "order distribution of the surplus equitably among the claimants." Md. Rule 14-216(a).

In this case, we must review an order from the Circuit Court for Baltimore City denying a claim for surplus funds as payment for destructive actions allegedly carried out on the foreclosed property by its former owner. The circuit court denied the claim based on language in the sale contract that assigned the risk of loss or damage to the property to the purchaser upon the date of sale but before legal title and possession had passed.

Appellant calls upon us to decide three questions, which we have consolidated into one central issue:[1]

---

[1] Appellant phrased its questions as follows:

1. Did the Circuit Court err by finding that the terms of a sale contract between a the [sic] Court as vendor (acting through the Substitute Trustees) and the foreclosure purchaser somehow prevented a foreclosure purchaser from filing a claim against a former owner's foreclosure surplus proceeds for post-sale property damages caused by the former owner before the foreclosure purchaser gained possession of the Property

Did the trial judge err in ruling, as a matter of law, that the terms of the foreclosure sale contract preclude Appellant's claim for surplus funds for voluntary waste to the foreclosed property?

As we explain, we answer in the affirmative and remand this case to the circuit court.

## BACKGROUND

### FACTUAL BACKGROUND

The property at issue in this case is a six-unit apartment building, located at 1422 Park Avenue in Baltimore, formerly owned by Zewdi Real Estate Holdings, LLC ("Zewdi" or "former owner"). As a result of Zewdi's ongoing default on a promissory note secured by a deed of trust, the property was foreclosed upon in March 2022. Appellant, Wonder City, LLC ("Wonder City"), purchased this property in a foreclosure sale on June 16, 2022, for $580,000.

The Circuit Court for Baltimore City ratified the sale on October 13, 2022. In the intervening time between the sale and ratification, Walter Dixon,[2] acting as an authorized

---

and where the former owner is a commercial landlord designated as a Maryland limited liability company?

2. Even if the as-is and risk of loss terms in a foreclosure sale contract can be relied on by a foreclosed property owner that wrongfully damaged a property post-sale, then did the Circuit Court abuse its discretion solely relying on terms of the sale and disregarding precedential case law and Maryland Rule 14-216 that allows it to excise or modify terms of foreclosure sales due to principles of equity and public policy?

3. Did the Circuit Court err by not exercising its discretion at all and never reaching the merits and specific evidence of the foreclosure purchaser's surplus claim?

[2] Mr. Dixon is the General Manager of Building Service Associates, LLC, where he carries out a range of services including "property repair requests, bankruptcy, estate and

2

agent of Wonder City, conducted ten site visits to the property between June 17 and October 11.[3] Mr. Dixon observed several instances of what he believed to be deliberate destruction of the property, to which he attested in an affidavit submitted to the court.

First, Mr. Dixon observed an accumulation of a "sheer amount of waste and debris" including "heaps of trash, including rotten food, bulk construction debris, discarded appliances and mattresses" at his July 27 visit, which had not been present during his first inspection on June 17. These conditions fostered a "repugnant odor and flies" that were "noticeable from afar," as well as a "full-blown rat infestation" throughout the building.

Mr. Dixon observed significant damage to the building as a result of the rat infestation. He observed that rats had chewed through electrical wiring in the attic and through various water pipes in the basement, which caused small leaks throughout the building and, in one of the six units, visible mold. He noted that, in response to tenant complaints, the former owner had spread rat poison throughout the building, which resulted in an amassment of rat carcasses that created a biohazard on the property. The property required fumigation to address these issues. In August, Mr. Dixon learned that the Baltimore City Department of Housing and Community Development was concerned that

foreclosure property cleanouts, water remediation services, . . . commercial property inspections, . . . and all aspects of building and facility repairs, maintenance, and management, including heating, cooling, mechanicals, and electrical components."

[3] Mr. Dixon inspected the property on the following dates in 2022: June 17; June 27; July 8; July 30; August 8; August 18; September 1; September 18; October 1; and October 11.

the property's condition was "ripe for rat infestation" and that such an infestation would spread to the neighboring properties.

On September 1, Mr. Dixon observed signs of power surges in the common areas of the building that left black burn marks on the walls. These marks had not been present on previous occasions. A tenant advised Mr. Dixon that there had been a blackout in the common areas a few days prior. Upon inspection, Mr. Dixon expected to find seven electrical meters, one for each of the six units and one for the property owner.[4] Instead, he found that the seventh had been removed completely and the electrical wiring rigged to bypass electrical metering, and thus avoid paying for electrical usage. Mr. Dixon posited that the meter tampering occurred around the time of the blackout prior to his visit on September 1, but noted that the entire meter line was properly connected upon his initial inspection on June 17. Mr. Dixon concluded that the compromised meter had caused the electrical circuitry to become overloaded, resulting in an arc flash that damaged the walls and ceiling in the building's basement.[5]

During his October 1 inspection, Mr. Dixon discovered that the vinyl flooring he had previously observed throughout the building's common areas had been removed. Mr. Dixon was also informed by one of the building's occupants that the former owner "had

[4] Each unit had its own electrical meter to measure usage for proper billing, while the building owner's meter on this property was designed to provide electricity for the common areas and the basement, as well as power a central heat boiler located in the basement, which provided heat and hot water to all the units.

[5] An "arc flash" is an electrical explosion characterized by the sudden discharge of light and heat as the result of a malfunction in electrical wiring.

remove[d] the condenser unit, which is an integral part of centralized A/C and heat system[s]," from one of the units. The condenser unit was present during the June 17 visit.

Mr. Dixon provided a line-item invoice, estimating that the repairs for all the noted damage would cost $95,800.

## PROCEDURAL HISTORY

Following the foreclosure sale, Wonder City filed its first petition for a claim of surplus funds on September 9, 2022, requesting $7,500 per month for the fair market value of rent from the sale date until Wonder City could take possession of the property. Wonder City also filed a motion for judgment awarding possession of the property on September 13, 2022. The trial court granted Wonder City's petition for rent and denied the motion for judgment awarding possession on October 13, 2022.

Also on October 13, the court issued a final order ratifying the foreclosure sale. Wonder City then filed an emergency motion for judgment awarding possession on October 24, which the court granted on November 30.

Pursuant to its first petition, Wonder City received $7,500 per month for the fair market value of rent for five residential units until it gained possession of the units. On March 3, 2023, Wonder City filed a supplemental petition for surplus funds for rent paid by a tenant of the property to the former owner after the sale of the property to Wonder City. The circuit court denied this motion.

On August 9, 2023, Wonder City filed another supplemental petition for surplus funds based on the damage to the property, which occurred in the interim between the date of sale and ratification by the court. Wonder City claimed that the damage was the result

5

of wrongful conduct by the former owner. This petition formed the basis of the instant appeal.

**THE CIRCUIT COURT'S ORDERS**

The court denied Wonder City's petition for surplus funds to cover damage to the property in an order dated January 16, 2024. The order relied upon the language of the sale contract, which stated that the "[p]urchaser assumes the risk of loss or damage to the property from the date of sale forward."

Wonder City then filed a motion to reconsider the denial of its petition. The trial court denied the motion for reconsideration in an order dated March 22, 2024, finding that "it is firmly established [under Maryland law] that the ratification of a judicial sale is the equivalent to a valid contract of sale, which vests complete equitable title in the purchaser from the date of sale." The court cited to *Royal Ins. Co. v. Drury*, 150 Md. 211 (1926) and *Bowdoin v. Hammond*, 79 Md. 173 (1894) as support for the proposition that the purchaser bears any loss to the foreclosed property that occurs between the date of the sale's ratification and the formal passage of legal title.[6]

The circuit court concluded that Wonder City bore the risk of all loss or damage to the subject property from the date of the foreclosure sale, June 16, 2022, onward. Wonder City noted a timely appeal for the denial of the motion for reconsideration of its Supplemental Petition for Allowance of Claim from Surplus Funds.

---

[6] Of note, *Bowdoin* refers to a *ratification nisi*, or a conditional ratification, that occurred shortly after the date of sale; this is not to be confused with full ratification by the court when the right to seek possession transfers to the purchaser. 79 Md. at 173.

6

**STANDARD OF REVIEW**

In matters decided without a jury, Maryland Rule 8-131(c) provides that "an appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses."

Maryland Rule 14-216(a) dictates that following the filing of a petition for surplus funds, "[t]he court shall order distribution of the surplus [proceeds from a foreclosure sale] equitably among the claimants." Trial courts are "granted broad discretion in granting or denying equitable relief[;]" however, "where an order [of a trial court] involves an interpretation and application of Maryland constitutional, statutory or case law, [appellate courts] must determine whether the trial court's conclusions are 'legally correct' under a *de novo* standard of review." *Schisler v. State*, 394 Md. 519, 535 (2006) (quoting *Garfink v. Cloisters at Charles, Inc.*, 392 Md. 374, 383 (2006)); *see also Ehrlich v. Perez*, 394 Md. 691, 708 (2006) ("We review *de novo* a trial judge's decision involving a purely legal question.").

**DISCUSSION**

In many respects, a foreclosure sale is just like any other conveyance of real property, in that the date of sale is not the end of the transaction. Upon the sale of a foreclosed property, the purchaser gains an inchoate equitable interest in the property but does not yet have legal title or a right to possession. *Empire Props., LLC v. Hardy*, 386 Md. 628, 650 (2005). The purchaser at a foreclosure sale is not actually entitled to possession until the purchase price is paid and legal title passes through conveyance of the

7

deed. *Legacy Funding LLC v. Cohn*, 396 Md. 511, 515 (2007). In an ordinary conveyance of real estate, the doctrine of equitable conversion generally allocates the risk of loss to the purchaser upon the date of sale,[7] absent a contractual provision to the contrary. *See White v. Simard*, 152 Md. App. 229, 247–48 (2003), *aff'd*, 383 Md. 257 (2004). In the case of an "as is" sale, the purchaser bears considerably greater risk, and generally has no remedy for later-discovered damage to, or defects on the property, unless there is a showing that the seller committed fraud or otherwise acted in bad faith. *See, e.g.*, *AXE Props. & Mgmt., LLC v. Merriman*, 261 Md. App. 1, 9–14 (2024) (reaffirming a prior holding that an "as is" purchase of property did not preclude an equitable remedy for the purchaser when the seller had constructive knowledge of latent defects).

The foreclosure sale differs in that the seller is neither the property owner nor an agent of the owner. In the foreclosure context, "the court itself is the vendor" who appoints a trustee to carry out the sale as an agent of the court. *Merryman v. Bremmer*, 250 Md. 1, 8 (1968). It has long been established in Maryland foreclosure cases that when a sale is made "under authority of a Court, the contract is not regarded as consummated until it has received the Court's sanction or ratification, and, therefore, any loss happening before

---

[7] The doctrine of equitable conversion "is a theoretical change of property from realty to personalty, or *vice versa*, in order that the intention of the parties, in the case of a contract of sale, … may be given effect." *DeShields v. Broadwater*, 338 Md. 422, 437 (1995) (internal citations omitted). Under this doctrine, "when the vendee contracts to buy and the vendor to sell, though legal title has not yet passed, in equity the vendee becomes the owner of the land, the vendor of the purchase money." *Id.* (quoting 8A Thompson, *Real Property,* § 4447 at 273–74 (Grimes Repl. Vol. 1963)).

confirmation falls upon the vendor." *Brewer v. Herbert*, 30 Md. 301, 311 (1869) (citations omitted).

The terms within an advertisement for a foreclosure sale "automatically become a part of the contract that is made when the sale is ratified." *Thomas v. Dore*, 183 Md. App. 388, 400 (2008); *White*, 152 Md. App. at 244. "'As a general rule, parties are free to contract as they wish.' More specifically, parties are free to contract away rights and consequences that normally would flow from the shift in equitable title arising from a contract." *White*, 152 Md. App. at 248 (internal citations omitted). Such a contract is not, however, exempt from the principles of equity. *See Dore*, 183 Md. App. at 402–05. "'[F]raud, duress, mistake, or some countervailing public policy' may serve as occasions to modify or excise certain terms of a contract." *Baltrotsky v. Kugler*, 395 Md. 468, 480 (2006) (quoting *Calomiris v. Woods*, 353 Md. 425, 445 (1999)).

In *Thomas v. Dore*, this Court said directly that a contractual provision may be "trumped" by equitable considerations. 183 Md. App. at 405. In *Dore*, a foreclosure purchaser sought to abate the payment of interest on the remainder of the property's purchase price after ratification of the sale was delayed due to the former owner's filing of exceptions. *Id.* at 391–92. The sale contract provided that interest shall not be abated for any reason. *Id.* at 398. Without addressing the merits of the purchaser's claim, the trial judge ruled, as a matter of law, that the terms of the contract precluded abatement under any circumstances. *Id.* at 406. We found this ruling to be in error, concluding that the judge must hear the merits of the claim and exercise his or her discretion to determine if the circumstances warrant setting aside the contract provision. *Id.* at 405–06.

9

The case *sub judice* is the same. The trial judge here ruled, as a matter of law, that the terms of the sale contract precluded Wonder City from recovering for any damage to the property following the date of sale, without addressing the merits of Wonder City's accusations of waste. The judge relied upon the language of the sale advertisement for the property which stated that, "[p]urchaser assumes the risk of loss or damage to the property from the date of sale forward." Such strict reliance was in error because it is possible here, as it was in *Dore*, that equitable considerations—particularly Wonder City's allegation that Zewdi deliberately damaged the property while it was still in its possession—justify excising the risk-of-loss provision of the sale contract. In so holding, we do not presuppose the outcome on the merits of Wonder City's claim, but it was imperative for the trial court to exercise its discretion to assess Wonder City's allegations and determine whether equity demanded a different result.

Maryland Rule 14-216(a) provides that, "[a]t any time after a sale of property and before final ratification of the auditor's account, any person claiming an interest in the property or in the proceeds of the sale of the property may file an application for the payment of that person's claim from the surplus proceeds of the sale." The Rule further directs a court to "order distribution of the surplus equitably among the claimants." Md. Rule 14-216(a). Relying on this Rule, Wonder City petitioned the circuit court for a claim against the surplus proceeds from the sale of the subject property, alleging that the former owner, Zewdi, caused significant waste to the property when the property was still in its possession, creating $95,800 in damage.

10

Wonder City's petition was denied. Wonder City then moved for reconsideration, arguing that the court's reliance on the provision that "[p]urchaser assumes the risk of loss" was misplaced and that strict adherence to that language was "illogical and inequitable." The court subsequently denied Wonder City's motion, saying that it "[found] the language to be unambiguous."

The contractual provision at issue here, if strictly applied, would require the purchaser to bear the entire risk of loss or damage to a property which the purchaser is not yet entitled to possess, even when the damage at issue was the result of deliberate acts by the former owner who still has lawful possession. Such a principle is at odds with more than a century of Maryland law, which establishes that a foreclosure sale is not complete and full equitable title is not conveyed until the sale is ratified by the court. *See, e.g.,* *Hanover Fire Ins. Co. v. Brown*, 77 Md. 64, 71 (1893) (holding that a contract of sale becomes complete upon ratification); *Bowdoin*, 79 Md. at 178 ("Where property is sold under a decree of the court, and a loss occurs before the sale is ratified, the loss falls upon the owner, and not upon the purchaser, for the reason that the contract of sale is not a complete sale until it has received the sanction of the court."); *Merryman*, 250 Md. at 8 ("[U]pon final ratification of the sale by the court the contract of purchase becomes complete. When the sale is finally ratified, the purchaser's inchoate equitable title, acquired at the time of the acceptance of his offer by the trustee, becomes complete and the purchaser's equitable title is established retroactively to the time of the original acceptance of the offer by the trustee.") (internal citations omitted).

In *Empire Properties, LLC v. Hardy*, our Supreme Court discussed the progression of a purchaser's interest in a foreclosed property, and included how those respective interests affect entitlement to possession.

> [P]rior to ratification in the Circuit Court, a purchaser at a foreclosure sale has an inchoate equitable title to the property. Generally at this early stage a purchaser is not yet entitled to possession of the property absent sufficient reasons otherwise (*e.g.*, waste, deed of trust provides for possession before judicial sale or court ratification, *i.e.*, upon default, etc.). When the foreclosure sale is thereafter ratified by the Circuit Court (if it is ratified at all) and complete equitable title accrues to the purchaser, the purchaser may *then* be entitled to seek possession of the property and an equity court, on a case-by-case basis, and upon proper notice, has the discretion, unless the circumstances warrant otherwise, to grant possession. The legal title to the property is not conveyed, however, until the purchase price is paid and other terms of sale, if any, are met and a deed of conveyance delivered.

386 Md. at 650 (emphasis in original) (footnote omitted).

The Supreme Court further clarified this ruling in *Legacy Funding LLC v. Cohn*, where it said:

> The effective holding of *Empire*, and thus the current view of this Court, is that the purchaser becomes entitled to possession only when it has either paid the full purchase price in conformance with the terms of sale and received a conveyance of legal title to the property, or, following ratification of the sale but prior to settlement, has received an order for possession from the court.

396 Md. at 515–16.

We agree with Wonder City that, during this precise period when a foreclosure purchaser has only an inchoate equitable interest in the foreclosed property and is not yet entitled to seek possession, it would be inequitable to impose upon the purchaser complete liability for any and every possible kind of damage to the property, including damage brought about by the deliberate acts of the former owner. This is particularly so given the

12

generally acrimonious nature of foreclosure proceedings. "'Once the hammer comes down at the auction, there is a reasonable tendency for the purchaser to become very uneasy about the borrower's continued possession: waste, insurance issues, liability issues, removal of sinks, tubs, fixtures and built-in appliances, cabinets, storage sheds, pools, equipment, all seem up for grabs as a borrower, sometimes furious, malicious and hot-tempered, moves out.'" *Empire Props.*, 386 Md. at 649–650 (quoting ALEXANDER GORDON IV, GORDON ON MARYLAND FORECLOSURES § 26.3, at 1062–64 (4th ed. 2004)).

Such circumstances implicate the doctrine of waste. Section 14-102 of the Real Property Article provides that any mortgagor, including any person in possession of land, who commits or permits waste is liable for the actual damages suffered by the property. "Waste is 'the destruction, misuse, alteration or neglect of premises by one lawfully in possession thereof, to the prejudice of the estate or interest therein of another.'" *Jaffe-Spindler Co. v. Genesco, Inc.*, 747 F.2d 253, 257 (4th Cir. 1984) (quoting 78 Am. Jur.2d *Waste* § 1 (1975)). "A mortgagor's liability for waste 'is in the nature of a tort' and is based upon 'a breach of a duty arising from the mortgage relationship.'" *Boucher Inv., L.P. v. Annapolis-West Ltd. P'ship*, 141 Md. App. 1, 18 (2001) (quoting Restatement (Third) of Property: Mortgages § 4.6 cmt. a, at 264 (1996)). There are two different types of waste: permissive and voluntary. *Id.* Permissive waste results generally from negligence and involves acts of omission rather than commission. *Id.* Voluntary waste, on the other hand, "'is active or positive, and consists in doing some act of destruction or devastation[.]'" *Id.* (quoting 93 C.J.S. Waste § 1 (1956)). The feature common to waste cases "is a judicial

finding that a duty to preserve the subject property had been breached and that the breach had resulted in the impairment of an interest in that property." *Id.* at 19.

Voluntary waste committed by a former owner during the liminal period where the foreclosure sale has occurred but the former owner is still in lawful possession of the property prejudices the purchaser's inchoate equitable interest in the property. The purchaser may suffer damages without the ability to intervene and protect his or her interest because the purchaser is not yet entitled to seek possession. As a matter of equity and public policy, such circumstances may justify setting aside the risk-of-loss shifting provision from the foreclosure sale contract. To hold otherwise would leave a foreclosure purchaser without a remedy in the event that the former owner vindictively damages the property while moving out.

Wonder City also draws attention to the contract's "as is" provision, arguing that the court should have exercised its discretion to excise this term from the contract in the interest of equity. This term is not expressly mentioned in the circuit court's order. To the extent the circuit court relied on the contract's "as is" provision in denying an equitable remedy, we hold that this was in error. In the same way that an "as is" provision disclaims the potential existence of latent defects only insofar as the seller does not actively conceal such defects, here, the "as is" provision does not excuse the alleged deliberate bad-faith actions on the part of the former owner before the property had come into Wonder City's possession.

Wonder City's agent, Mr. Dixon, meticulously documented the damage to the foreclosed property that he observed during the period between the foreclosure sale and

14

ratification, which he attributed to Zewdi's actions. The evidence in the record was sufficient to create a triable issue of fact as to whether voluntary waste occurred such that equity would necessitate excising the provision of the contract which provided that, "[p]urchaser assumes the risk of loss or damage to the property from the date of sale forward." As was the case in *Dore*, the circuit court judge here did not consider the circumstances surrounding the damage to the property. Instead, the circuit court's ruling was based solely on the contract provision. The case, therefore, must be remanded to the circuit court for its consideration of Wonder City's motion on its merits.

## CONCLUSION

The judgment of the Circuit Court for Baltimore City is vacated and remanded for further proceedings consistent with this opinion.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY VACATED AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.**

15